UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| CATHY WOODS (a/k/a ANITA CARTER), by and through her Personal Representative, LINDA WADE, | Case No. 3:16-cv-00494-MMD-VPC |
| Plaintiff, | ORDER |
| v. | |
| CITY OF RENO, NEVADA, *et al.*, | |
| Defendants. | |

## I.    SUMMARY

This is a civil rights action arising out of the alleged wrongful imprisonment for 35 years of Plaintiff Cathy Woods. Pending before this Court are three motions: (1) Defendants Calvin Dunlap and Washoe County's (collectively, "County Defendants") Motion to Dismiss ("County Defendants' MTD") (ECF No. 70); (2) Defendants Donald Ashley and Clarence "Jackie" Lewis's (collectively, "Louisiana Defendants") Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction ("Louisiana Defendants' MTD") (ECF No. 72); and (3) Defendants City of Reno and Lawrence Dennison's (collectively, "Reno Defendants") Motion to Dismiss Second Amended Complaint ("Reno Defendants' MTD") (ECF No. 73).

For the reasons discussed below, County Defendants' MTD is granted in part and denied in part, Louisiana Defendants' MTD is denied, and Reno Defendants' MTD is granted in part and denied in part.

## II. BACKGROUND

Plaintiff Cathy Woods (also known as Anita Carter) initiated this action through her personal representative Linda Wade on August 22, 2016. (ECF No. 1.) On September 8, 2016, Plaintiff filed her First Amended Complaint ("FAC"). (ECF No. 20.) On April 4, 2017, this Court granted Plaintiff leave to file her Second Amended Complaint ("SAC"). (ECF No. 66.) As a result, the Court denied as moot three pending motions to dismiss (ECF Nos. 28, 31, 32.) The following facts are taken from the SAC.

Plaintiff moved to Reno, Nevada, in 1969 and lived there until 1977. In February 1976, Plaintiff was working as a bartender and manager of a bar in Reno in spite of her diagnosis of schizophrenia, her level of education (she received only a sixth-grade level education), her bare ability to read, and her below average IQ.

On February 24, 1976, the car of Michelle Mitchell, a 19-year-old University of Nevada student, broke down near the Reno campus. She used a pay phone to call her mother to come pick her up. When her mother arrived, Mitchell was not there.

Mitchell's body was subsequently found in the detached garage of a house on Evans Avenue, near the campus, with her hands tied behind her and her throat slashed. No weapon was found. Near her body was a cigarette butt, and there were two sets of footprints on the dirt floor of the garage. One set of footprints was Mitchell's while the other appeared to belong to a male with an approximate shoe size of 9 or 9.5.

After Mitchell's death, several witnesses came forward with information. For instance, two witnesses told the police that as Mitchell walked back to her car after making the phone call to her mother, a man came out from near her car and put his arms around her. The two witnesses described the man as taller than Mitchell (she was roughly 5'11"). Other witnesses reported a suspicious man running from the scene of the crime around the time the crime had purportedly occurred. Another witness told police she almost hit a man who ran out in front of her car, who appeared to have run from the scene of the crime, and that this man also appeared to have blood on him. As ///

a result, police worked with law enforcement agencies in Northern California and the Pacific Northwest in search of a single, male serial criminal.

The following year, in 1977, Plaintiff moved to Shreveport, Louisiana, to be with her family. Less than a year after the move, Plaintiff's mental health deteriorated, and she was involuntarily committed to Central Louisiana State Hospital from October to December of 1978. Then, in February of 1979, Plaintiff was involuntarily committed again, this time at the LSU Medical Center in Shreveport, Louisiana. At the time, Plaintiff was extremely psychotic and suffering from a thought disorder as a result of her schizophrenia—she was unable to think in a logical or coherent fashion. Plaintiff was also having auditory hallucinations—she heard voices that were not there.

On or about March 6, 1979, Plaintiff allegedly made vague statements to a counselor at LSU Medical Center, Carol Sherman, about a girl, Mitchell, who had been murdered in Reno. Sherman then contacted Shreveport police detective Donald Ashley. As a result, Ashley and his partner, Clarence Lewis, began to investigate the Mitchell murder. They listed the case as a "foreign homicide" in Reno, Nevada, with a unique case number and supposedly knew that, if they were successful in their investigation, Plaintiff would be prosecuted and possibly convicted in the state of Nevada. (ECF No. 67 at ¶¶ 53-54.) Ashley and Lewis then interviewed Sherman about her conversations with Plaintiff and decided to contact the Reno Police Department ("RPD"). "[E]ven though [Plaintiff's] statement bore no indicia of reliability," after their arrival RPD officers decided to re-interview Sherman. (*Id.* at ¶ 56.)

Before initiating their investigation in Louisiana, RPD officers "conferred with Defendant Dunlap . . . about what their next investigative steps should be," and Dunlap, the Washoe County District Attorney at the time, "provided advice and direction to the other Defendants about how to conduct their investigation." (*Id.* at ¶ 57.) Defendant Dennison, an RPD officer, had traveled to Louisiana after Ashley contacted RPD about Plaintiff's statements to Sherman. Once there, Dennison agreed with Ashley and Lewis to continue to pursue Plaintiff as a suspect. "Pursuant to that agreement," the three

officers[1] then went to LSU Medical Center. Once there and over the course of March 7 and 8, 1979, they interviewed Plaintiff with supervision and advice from Defendant Dunlap. During the interview, a medical student, Douglas Matthew Burks, was present, and Defendants Ashley and Lewis agreed to "participate, conduct, and cooperate" with RPD during the interviews (*id.* at ¶ 70).

At the time of the initial interview by police, Plaintiff had not responded to her psychiatric medication and was having difficulty communicating in a logical and linear fashion. None of Defendant officers, nor any other individual, informed her of her constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 486 (1966), and Plaintiff was not free to leave the room in which she was being questioned. Plaintiff indicated to the officers that she did not have any personal knowledge about the Mitchell murder. Regardless, the officers secured a "false and involuntary confession" from Plaintiff by: "(a) asking leading questions that supplied [Plaintiff] with non-public information about the crime; (b) asking her the same questions repeatedly even when she was unable to answer; (c) telling her to guess the answers to questions when she did not know the answers; (d) correcting her complete guesses to match the facts of the crime; (e) pressuring her[] while supplying correct information in an effort to get her to change her answers to their questions; (f) otherwise feeding her information about the crime so that the 'confession' she involuntarily gave would appear consistent and reliable." (ECF No. 67 at ¶ 84.) This confession was not recorded, memorialized, or written down in any way, either by the Defendant officers or Plaintiff, contemporaneously with these initial interviews. Instead, these Defendants "later memorialized [Plaintiff's] purported confession" and added "non-public facts about the crime to make it appear as if [Plaintiff's] false confession were [*sic*] reliable" despite Plaintiff recalling only "vague information about the crime that had been publicly reported." (ECF No. 67 at ¶¶ 96-98.)

---

[1]Based on the allegations in the SAC, it appears another RPD detective, John Kimpton, participated in the interviews and initial investigation in Shreveport. (*See, e.g.*, ECF No. 67 at ¶¶ 70, 105.) However, Kimpton is no longer a named defendant in this action.

4

Between March 7 and 8, Plaintiff also informed one of her physicians, Linda Boswell, that she wanted to have an attorney, which Boswell then relayed to Defendant officers. Despite this, Dennison, Dunlap, Ashley, Lewis, and Kimpton, *see supra* n.1, agreed to question Plaintiff again, and "one or more of these defendants falsely promised [Plaintiff] that things would go 'quicker' and easier if she did not have an attorney." (*Id.* at ¶ 105.) In addition, on March 8, 1979, the officers searched the Shreveport home of Plaintiff's mother after Ashley, Dunlap, Dennison, and Kimpton obtained a search warrant. They indicated that they were looking for a murder weapon, and Plaintiff was handcuffed and further questioned at the house during the search. Lewis then took Dennison and Plaintiff back to LSU Medical Center so that Dennison could continue to question Plaintiff while Dunlap, Ashley, and Kimpton continued to search the home. Nothing was found at the home. The following day—March 9, 1979—Lewis and Kimpton returned to the house of Plaintiff's mother in order to question her about Plaintiff's activities during the time that Plaintiff lived in Reno.

Other alleged activities of the officers included: Lewis and Kimpton going to the Rines Alcohol Abuse Center to find out more information about Plaintiff; Lewis obtaining the Shreveport Police Department rap sheet and mug shot of Plaintiff which he then provided to Reno-based law enforcement; and, Ashley and Lewis continuing to investigate after Dennison, Dunlap, and Kimpton returned to Reno by, for instance, re-interviewing Sherman.

Plaintiff was ultimately extradited to Reno, and, in 1980, she was tried for and convicted of the murder of Mitchell. At trial, the State—through District Attorney Dunlap--argued that "[Plaintiff] committed the crime alone and that she did so out of rage because Mitchell had rejected sexual advances by [Plaintiff]," who was a homosexual and therefore a "sexual deviant." (*See* ECF No. 67 at ¶ 125.) In her defense, Plaintiff pointed to testimony regarding a man fleeing the crime scene who was markedly taller than herself and who had a larger shoe size. Upon conviction, Plaintiff was sentenced to life without the possibility of parole, but this conviction was subsequently overturned on

direct appeal. Plaintiff was then tried a second time—this time not by Dunlap—and, once again, there was no physical evidence tying her to the crime. Yet, Plaintiff was convicted a second time for the murder of Mitchell and sentenced to life in prison without the possibility of parole.

Ultimately, on September 10, 2014, Plaintiff's conviction was vacated as a result of DNA evidence that linked a man by the name of Rodney Halblower[2] to the crime scene. In March 2015, the remaining charges against Plaintiff were dismissed at the request of the State, and the State publicly declared that Plaintiff was innocent and did not commit the crime.

Plaintiff brings eleven claims for relief: (1) involuntary confession in violation of the 5th and 14th amendments (42 U.S.C. § 1983); (2) due process violation under the 14th amendment (42 U.S.C. § 1983); (3) federal malicious prosecution in violation of the 4th and 14th amendments (42 U.S.C. § 1983); (4) failure to intervene (42 U.S.C. § 1983); (5) conspiracy to deprive constitutional rights (42 U.S.C. § 1983); (6) malicious prosecution under Nevada law; (7) abuse of process under Nevada law; (8) intentional infliction of emotional distress under Nevada law; (9) civil conspiracy under Nevada law; (10) *respondeat superior* under Nevada law; and (11) indemnification under Nevada law. (ECF No. 67 at ¶¶ 153-235.)

### III. LOUSIANA DEFENDANTS' MTD (ECF No. 72)

Louisiana Defendants move to dismiss based on a lack of personal jurisdiction. Plaintiff responds that the Court has specific jurisdiction over Louisiana Defendants. The Court agrees.

#### A. Legal Standard

In opposing a defendant's motion to dismiss for lack of personal jurisdiction, a plaintiff bears the burden of establishing that jurisdiction is proper. *Boschetto v.*

---

[2]Halblower is currently incarcerated in Oregon. DNA evidence has linked him to the murders of three young women in Northern California that occurred around the same time as Mitchell's murder. (ECF No. 67 at ¶ 142.)

*Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008). Where, as here, the defendant's motion is based on written materials rather than an evidentiary hearing, "the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Brayton Purcell LLP v. Recordon & Recordon,* 606 F.3d 1124, 1127 (9th Cir. 2010) (internal quotation marks omitted). The plaintiff "cannot 'simply rest on the bare allegations of its complaint,' . . . [but] uncontroverted allegations in the complaint must be taken as true." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (quoting *Amba Mktg. Sys.*, *Inc. v. Jobar Int'l, Inc.*, 551 F.2d 784, 787 (9th Cir. 1977)). The court "may not assume the truth of allegations in a pleading which are contradicted by affidavit," *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1284 (9th Cir. 1977), but it may resolve factual disputes in the plaintiff's favor, *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006).

### B.    Discussion

A two-part analysis governs whether a court retains personal jurisdiction over a nonresident defendant. "First, the exercise of jurisdiction must satisfy the requirements of the applicable state long-arm statute." *Chan v. Soc'y Expeditions*, 39 F.3d 1398, 1404 (9th Cir. 1994). Since "Nevada's long-arm statute, NRS § 14.065, reaches the limits of due process set by the United States Constitution," *see Baker v. Eighth Judicial Dist. Court ex rel. Cty. of Clark*, 999 P.2d 1020, 1023 (Nev. 2000). the Court moves on to the second part of the analysis. That is, "the exercise of jurisdiction must comport with federal due process." *Chan*, 39 F.3d at 1404-05. "Due process requires that nonresident defendants have certain minimum contacts with the forum state so that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice." *Id.* (citing *Int'l Shoe v. Washington*, 326 U.S. 310, 316 (1945)). Courts analyze this constitutional question with reference to two forms of jurisdiction: general and specific jurisdiction.

Plaintiff concedes that general jurisdiction does not apply to Louisiana Defendants. (ECF No. 78 at 2 n.1.) Instead, Plaintiff argues that specific jurisdiction

applies because Louisiana Defendants were more than "arresting officers"; they investigated and aided in the prosecution of Plaintiff for a murder that had occurred in Nevada. (*Id.* at 2.)

Specific jurisdiction exists where "[a] nonresident defendant's discrete, isolated contacts with the forum support jurisdiction on a cause of action arising directly out of [the defendant's] forum contacts[.]" *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1075 (9th Cir. 2011). Courts use a three-prong test to determine whether specific jurisdiction exists over a particular cause of action: "(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable." *Id.* at 1076 (quoting *Schwarzenegger*, 374 F.3d at 802)). The party asserting jurisdiction bears the burden of satisfying the first two prongs. *Id.* at 1076 (citing *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990)). If she satisfies the first two prongs, then the burden shifts to the party challenging jurisdiction to set forth a "compelling case" that the exercise of jurisdiction would not be reasonable. *Id.* at 1076 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78 (1985)).

### 1.    First Prong

Plaintiff has met her burden on the first prong of the specific jurisdiction analysis.

"The first prong of the specific jurisdiction test refers to both purposeful availment and purposeful direction." *CollegeSource, Inc.*, 653 F.3d at 1076. Cases involving tortious conduct are analyzed under the rubric of purposeful direction.[3] *Id.* (citing *Schwarzenegger*, 374 F.3d at 802).

---

[3]Defendants rely on a Ninth Circuit opinion, *Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001), in part to argue that the appropriate standard for a § 1983 claim is *(fn. cont…)*

8

Here, because Plaintiff's claims sound in tort, the Court must first ask whether Louisiana Defendants "purposefully directed" their activities at the forum state by applying an "effects" test that looks to the forum in which Louisiana Defendants' actions were felt, "whether or not the actions themselves occurred within the forum." *See Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (en banc). The "effects test" requires that "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Id.* (internal alterations and quotation marks omitted). The Supreme Court qualified the effects test in *Walden v. Fiore* by emphasizing that "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way," and that the plaintiff "cannot be the only link between the defendant and the forum." 134 S. Ct. 1115, 1122, 1125 (2014). Rather, "[a] forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum." *Id.* at 1123. "If personal jurisdiction exists over one claim, but not others, the district court may exercise pendent personal jurisdiction over any remaining claims that arise out of the same common nucleus of operative facts as the claim for which jurisdiction exists." [4] *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015) (internal quotation marks and citation omitted).

---

*(…fn. cont.)*
"purposeful availment." (ECF No. 72 at 8, n.1.) However, in that case, despite the Ninth Circuit's use of the term "purposeful availment," the test applied was one of purposeful direction as measured by their stated standard—"engages in conduct aimed at, and having effect in, the state." 250 F.3d at 692 (internal quotations, alterations and citation omitted). By contrast, the test for purposeful availment, which is applied by the Ninth Circuit in contract cases, asks whether the defendant "purposefully avails itself of the privilege of conducting activities or consummates a transaction in the forum, focusing on activities such as delivering goods or executing a contract." *Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (en banc) (internal alterations and quotation marks omitted).

[4]Louisiana Defendants cite to out-of-circuit case law to argue that Plaintiff must show that this Court has personal jurisdiction over each Defendant for each claim. (*See* ECF No. 72 at 8-9.) However, because the Ninth Circuit permits pendent personal *(fn. cont…)*

Louisiana Defendants argue that they acted merely as arresting officers. (ECF No. 72 at 9-12.) However, that is not the extent of their conduct as alleged in the SAC. Plaintiff alleges that Louisiana Defendants directed their activities to the state of Nevada specifically by laying the investigatory groundwork for the state's subsequent prosecution of Plaintiff, whose conviction was based in large part on her supposed involuntary and fabricated confession, and for the benefit of Nevada's legal system. In particular, the SAC alleges that Louisiana Defendants engaged in specific intentional acts directed at the state of Nevada's subsequent prosecution of Plaintiff knowing that if they were successful, the prosecution would occur in Nevada. (ECF No. 67 at ¶¶ 53-54.) Those alleged acts consist of: (1) preparing their own police reports (*id.* at ¶ 54); (2) interviewing Plaintiff's counselor, Sherman, both before and after the RPD officers arrived in Shreveport (*id.* at ¶¶ 55, 119); (3) interviewing Plaintiff[5] (*id.* at ¶ 73); (4) reaching out to RPD in Nevada and helping to prepare and review the RPD officers' reports (*id.* at ¶ 66); (5) participating in the subsequent memorialization of Plaintiff's purportedly false confession (*id.* at ¶¶ 96-97); (6) seeking and obtaining a search warrant jointly with Dennison and Dunlap (*id.* at ¶ 109); (7) interviewing Plaintiff's mother (*id.* at ¶ 116); and (8) attempting to gather more information about Plaintiff from other local sources (*see, e.g., id.* at ¶ 117). Moreover, Louisiana Defendants point out that they testified at Plaintiff's subsequent trial, ostensibly regarding her supposed confession and the investigatory acts they took in Shreveport on behalf of RPD. (*See* ECF No. 72 at 19-20.) In essence, the uncontroverted allegations in the SAC indicate Louisiana Defendants became a part of the RPD—at least in the early stages of the

_____

(…fn. cont.)

jurisdiction, it is sufficient for the Court's analysis where, as here, the claims all arise out of the same common nucleus of operative facts for which the Court may exercise specific personal jurisdiction over these Defendants. The Court therefore analyzes personal jurisdiction based on the Fifth and Fourteenth Amendment claims.

[5]The SAC collectively refers to Dennison, Dunlap, Ashley and Lewis as "Law Enforcement Defendants" and says that the Law Enforcement Defendants collectively did various acts, such as interrogating Plaintiff and subsequently memorializing her purportedly false confession. (ECF No. 67 at ¶¶ 17, 66, 96.)

investigation—when they did not have to and were more than mere arresting or extraditing officers.

Louisiana Defendants could have contacted RPD after hearing Sherman's allegations regarding Plaintiff and involved themselves in a more limited way, for instance by only acting as assisting officers during the search of the home of Plaintiff's mother or by only aiding in Plaintiff's arrest and extradition. Thus, Louisiana Defendants' intentional acts laid the investigatory foundation for the state of Nevada's subsequent prosecution of and harm to Plaintiff and are the basis for the claims in this action.

The two cases Louisiana Defendants rely on are dissimilar from the facts as presented by Plaintiff here. In *Walden v. Fiore*, a defendant seized cash from the plaintiffs in Atlanta where they were catching a connecting flight and then helped to draft an affidavit to show probable cause for forfeiture of funds that the defendant subsequently forwarded to a United States Attorney's Office in Georgia. 134 S. Ct. at 1119. There, the Supreme Court analyzed specific jurisdiction under two factors to ask whether: (1) the relationship between the defendant and the forum state—Nevada— arose out of contacts that the defendant himself had created with the state; and (2) the defendant's contacts were with the forum state itself as opposed to with persons who reside there. *Id.* at 1122-23. The Supreme Court stated these contacts cannot be "random, fortuitous, or attenuate" or the result of "unilateral activity." *Id.* at 1123. Based on these factors, the Court found that the defendant did not have the requisite contacts with Nevada; the defendant's actions in Georgia were directed at and injured plaintiffs, but these plaintiffs could have been from any state, not necessarily Nevada. *Id.* at 1125. Unlike the plaintiffs in *Walden* whose injury was not "tethered to Nevada in any meaningful way," *id.*, Plaintiff could only have been charged and prosecuted in Nevada, where the crime occurred, rendering her resulting injury "tethered to Nevada."

Similarly, in *Simmons v. Blumenfeld*, No. CV 14-4806-JFW (JEM), 2015 WL 9906164 (C.D. Cal. Dec. 10, 2015) (Report and Recommendation) and 2016 WL 284783 (C.D. Cal. Jan. 22, 2016) (Order accepting Report and Recommendation), the

court found that it did not have personal jurisdiction over the defendant because he merely arrested the plaintiff in Georgia pursuant to an arrest warrant issued in California, he had nothing to do with the arrest warrant upon which the plaintiff brought suit, and he was not involved in the plaintiff's extradition from Georgia to California. 2015 WL 9906164, at *10. By contrast, here, the reason for Plaintiff's prosecution and conviction in the state of Nevada for a crime committed in Nevada was the initial investigatory steps and contacts with Nevada law enforcement made by Louisiana Defendants as well as their participation in the initial interviews of Plaintiff, her counselor, and her mother. These Defendants followed up on a lead regarding a "foreign homicide," initiated an investigation by interviewing Sherman and contacting RPD, participated in the investigation by interviewing Plaintiff, obtained a search warrant, supplied this information to Reno through the sharing of police reports ostensibly in order to buttress the prosecution of Plaintiff in Nevada, and then testified during the trial in Nevada. These Defendants did not merely respond to an arrest warrant as did the defendant in *Simmons* or merely act as "strong arms" while RPD executed a search warrant or conducted an interview. (*Contrast* ECF No. 72 at 15-16.)

Therefore, the Court finds that Plaintiff has met her burden in showing that the first prong of the specific jurisdiction analysis is satisfied.[6]

## 2.  Second Prong

As to the second prong, "[i]n order for a [ ] court to exercise specific jurisdiction, 'the *suit* must 'arise out of or relate to the defendant's contacts with the *forum*.'" *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cnty.*, 137 S. Ct. 1773, 1780 (2017) (quoting *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014)) (internal

---

[6]Louisiana Defendants argue that the Court may not exercise personal jurisdiction over them under the civil conspiracy claims by relying on the SAC's conclusory allegations of a conspiracy amongst individual Defendants (*see* ECF No. 72 at 14-15). Again, this Court is permitted to exercise pendent personal jurisdiction over these claims so long as the Court has personal jurisdiction over Defendants as to one claim and so long as the civil conspiracy claims arise out of a common nucleus of facts. *See Picot*, 780 F.3d at 1211.

alterations omitted) (emphasis in original). In other words, there must be an affiliation between the controversy and the forum. *Id.*; *see also Shute v. Carnival Cruise Lines*, 897 F.2d 377, 397 (9th Cir. 1988), *overruled on other grounds*, 499 U.S. 585 (1991) (stating that the Ninth Circuit's "but-for" test requires "some nexus between the cause of action and the defendant's activities in the forum").

Based on the uncontroverted allegations in the SAC, Louisiana Defendants engaged in intentional acts that have an affiliation with the state of Nevada and which give rise to Plaintiff's Fifth and Fourteenth Amendment claims. This included not only reaching out to RPD in Nevada; it also included the initial investigatory acts of securing an involuntary and fabricated confession, which were performed in unison with RPD officers. These actions were taken to create the basis for prosecution of Plaintiff in a Nevada state court, for a crime committed in Nevada, and which clearly would benefit the state of Nevada. *See* discussion *supra* Sec. III.B.i. Thus, Plaintiff's Fifth and Fourteenth Amendment claims arise out of Louisiana Defendants' intentional acts to ensure a successful prosecution for the state of Nevada.

The Fifth and Fourteenth Amendment claims in this action have a clear affiliation with Louisiana Defendants' intentional acts. The Court may exercise pendent personal jurisdiction over the SAC's remaining claims.

### 3. Third Prong

Once a plaintiff has made a prima facie case demonstrating that specific jurisdiction over the defendant is constitutional, the burden shifts to the party contesting jurisdiction to "'present a compelling case' that the exercise of jurisdiction would be unreasonable and therefore violate due process." *CollegeSource, Inc.*, 653 F.3d at 1079 (quoting *Burger King*, 471 U.S. at 477-78). A court must determine whether the exercise of jurisdiction comports with "fair play and substantial justice," and is therefore "reasonable," by considering seven factors: "(1) the extent of the defendants' purposeful injection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the

forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum." *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1114 (9th Cir. 2002).

Louisiana Defendants argue that this Court's exercise of personal jurisdiction over them would be unreasonable for 6 reasons: (1) the only contact these Defendants had with Nevada was a phone call to Nevada officials alerting them of Plaintiff's location; (2) neither Defendant has any ties to Nevada thus defending this action would be burdensome for them; (3) subjecting law enforcement officers to personal jurisdiction in a foreign forum for actions taken in their home state and involving a home state resident would establish "an extremely burdensome precedent with broad-ranging implications"; (4) Nevada has no special interest in adjudicating claims against these Defendants because they are based on supposed tortious actions that occurred in Louisiana and involve the arrest and interrogation of a Louisiana resident; (5) witnesses to these Defendants' actions reside in Louisiana; and (6) there is an alternative forum for this action against these Defendants. (ECF No. 72 at 19-21.) Louisiana Defendants, however, concede that it would be more convenient for Plaintiff to bring this action in Nevada, at least with regards to the wrongful prosecution claim. (*Id.* at 21.) Plaintiff responds that this Court's exercise of specific personal jurisdiction over Louisiana Defendants is reasonable for 5 reasons: (1) the extent of these Defendants' contact with the state of Nevada exceeds a mere phone call to Nevada officials;[7] (2) the burden to Defendants of traveling to Nevada would only be for purposes of trial, not discovery or depositions; (3) there is no conflict with the sovereignty of Louisiana for Louisiana Defendants to appear for trial in Nevada; (4) Nevada has a special interest in this litigation given that Mitchell's murder was extensively publicized and that Plaintiff's exoneration was significant to Reno; and (5) piecemeal litigation—one case proceeding

---

[7]The Court finds that Louisiana Defendants' affidavits fail to controvert the SAC's allegations that they did more than make a phone call. (*See* ECF Nos. 28-1, 28-2.)

in Nevada while the other proceeds in Louisiana—is "preposterous"/most of the evidence in this case is based in Nevada. (ECF No. 78 at 17-20.)

The Court finds that exercising specific personal jurisdiction over Louisiana Defendants is reasonable despite the burden of travelling for trial, assuming that one occurs. The state of Nevada has a strong interest in the resolution of this case, as Plaintiff is allegedly the longest wrongfully imprisoned woman in the United States and contends that her conviction is based on the malicious investigation and prosecution by Reno and Washoe County officials. To the extent Louisiana Defendants contend that by exercising jurisdiction over them the Court is setting a burdensome precedent with broad-ranging implications (ECF No. 72 at 20; ECF No. 85 at 2-3[8]), the Court is not persuaded. First, the Court's exercise of personal jurisdiction under the circumstances here is consistent with the Ninth Circuit's decision in *Lee v. City of Los Angeles*. In *Lee*, the court found that it was reasonable for a California court to exercise jurisdiction over two New York officials despite their limited availment of California's administrative and judicial extradition procedures because these officials were "not mere passive participants in the extradition process." 250 F.3d 668, 694-95 (9th Cir. 2001). Because this Court has found that Louisiana Defendants purposefully directed particular acts for the benefit of Nevada, not as mere arresting officers but as investigators, and that these acts form part of the underlying common nucleus of operative facts for the claims in this case, it is similarly reasonable for them to be subject to jurisdiction in this state. Moreover, the Court's decision should not deter police officers from doing good work across state lines. The Court absolutely commends the work of police officers in

---

[8]The Court fails to see how "inter-state cooperation among law enforcement agencies will suffer" if this Court exercises jurisdiction over Louisiana Defendants. (*See* ECF No. 85 at 2.) The claims here are not based on the fact that Louisiana Defendants aided in the initial investigation of Plaintiff for the murder of Mitchell; the claims are based on improper conduct during an investigation that has a strong nexus, according to the allegations in the SAC, with Plaintiff's wrongful conviction and claims in this case. Moreover, there is already a distinction in the law between officers who cooperate with other states in merely arresting or extraditing fugitives and those who go beyond this. While there may be no case law with facts akin to those here, this does not preclude the Court from analyzing the facts of this case under the existing legal framework.

1    capturing fugitives for crimes committed in other states, but the SAC's uncontroverted

2    allegations paint Louisiana Defendants' involvement as more than mere arrest, capture,

3    or even extradition.

4         Therefore, the Court finds that the third prong of the specific jurisdiction analysis

5    weighs in favor of the exercise of specific personal jurisdiction over Defendants Ashley

6    and Lewis.

7         Louisiana Defendants' MTD is denied.

## IV.    ISSUE PRECLUSION

9         Both Reno and County Defendants argue in their motions to dismiss that

10   Plaintiff's claims stemming from the SAC's allegations of a coerced confession[9] are

11   barred by issue preclusion. (ECF No. 70 at 6-15; ECF No. 73 at 2, 4-9.) Therefore, the

12   Court addresses this issue separately first before addressing their specific motion. The

13   Court finds that issue preclusion does not apply to bar certain claims[10] because, upon

14   the state district court's vacating of Plaintiff's conviction, there are no longer any final

15   rulings on the voluntariness of Plaintiff's confession that may be asserted against her.

16   Fairness compels the same finding.

### A.    Legal Standard

18        When determining the preclusive effect of a state court judgment, a federal court

19   follows the state's rules of preclusion. *White v. City of Pasadena*, 671 F.3d 918, 926

20   (9th Cir. 2012). Under Nevada law, issue preclusion requires that (1) the issue decided

21        [9]Defendants seemingly lump all the claims together in arguing for issue
22   preclusion. For instance, Reno Defendants state that "[g]iven that Plaintiff's Complaint
     contains a cause of action for section 1983 involuntary confession, which … is stated
23   first so that it can then be incorporated into the other claims in the Complaint, there are
     indeed claims based on issues identical to [ ] those before the state courts, and thus
24   subject to issue preclusion." (ECF No. 84 at 3.) However, the only claim that clearly is
     based on an allegation of a coerced confession is Count I.

25        [10]In Plaintiff's opposition, she distinguishes her claim of a coerced confession into
26   two separate contentions: (1) her confession was involuntary in violation of the Fifth
     Amendment; and, seemingly in the alternative, (2) her purported confession was
     actually fabricated evidence in violation of the Fourteenth Amendment. (*See* ECF No.
27   77 at 33-34.) The trial court and Nevada Supreme Court never addressed whether
28   portions of Plaintiff's confession were fabricated by the police despite finding her
     confession to have been voluntarily made.

in the prior litigation is identical to the issue presented in the current action, (2) the initial ruling must have been on the merits and final, (3) the party against whom the judgment is asserted must have been a party or in privity with a party to the prior litigation, and (4) the issue was actually and necessarily litigated. *Five Star Capital Corp. v. Ruby*, 194 P.3d 709, 713 (Nev. 2008). The decision to apply issue preclusion is left to the court's discretion, *Robi v. Five Platters, Inc.*, 838 F.2d 318, 321 (9th Cir. 1998), and if there is any doubt as to the applicability of issue preclusion then it is not applied, *Durkin v. Shea & Gould*, 92 F.3d 1510, 1515 (9th Cir. 1996).

### B. Discussion

Plaintiff argues that issue preclusion does not apply to bar her Fifth Amendment claim or other claims stemming from her allegedly coerced confession because there is no longer a final judgment in place. Her conviction was vacated through the grant of a post-conviction motion for new trial, meaning that all prior rulings in her criminal case are now void. (ECF No. 77 at 19.) County Defendants respond that because Plaintiff's conviction was vacated on grounds unrelated to her purportedly coerced confession— i.e., on the basis of a genetic marker test of a cigarette butt found at the scene of the crime—the "state courts' rulings on the constitutionality of plaintiff's confession were 'final rulings' under Nevada law." (ECF No. 83 at 4 (citing *Nika v. State*, 198 P.3d 839, 848 n.52 (Nev. 2008)).) Similarly, Reno Defendants argue that the trace DNA and the investigators' conduct have no link to one another nor does the DNA evidence mean that investigators improperly obtained Plaintiff's confession, an issue they contend she has already had a full and fair opportunity to litigate. (ECF No. 84 at 3.) The Court, however, agrees with Plaintiff. Defendants have failed to meet the second requirement of issue preclusion, which requires that the initial ruling is final.[11]

---

[11]Plaintiff and Defendants argue over whether there needs to be an ultimate, final judgment or whether "judgment" under issue preclusion's third prong refers merely to interlocutory judgments. The Court declines to analyze their arguments under this prong and instead focuses on whether vacating a conviction through a post-judgment motion for new trial voids all earlier evidentiary rulings in the case for purposes of issue preclusion's second prong.

In the trial court's order[12] denying Plaintiff's motion to suppress the statements she made while she was at the LSU Medical Center, the trial court found that Plaintiff was not interrogated or in custody for purposes of *Miranda* when she made statements to Dennison, Ashley, and Dunlap[13] on March 7 and 8, 1979, and went on to find that "no statements should be suppressed because of a failure to give Miranda warnings and because the statements lack voluntariness." (*See* ECF No. 70-4 at 2; ECF No. 70-6 at 2-4.) Similarly, in the Nevada Supreme Court's decision dismissing Plaintiff's appeals, the court held that Plaintiff's inculpatory statements made during "an interview with a Reno police officer" were properly admitted at trial despite the failure to provide her with a *Miranda* warning, reasoning that Plaintiff was not in custody, and also found that Plaintiff voluntarily made these statements. (ECF No. 70-8 at 4.)

Issue preclusion does not apply to bar Plaintiff's claim of a coerced or involuntary confession because the lower court's evidentiary ruling (ECF No. 70-6) and the Nevada Supreme Court's 1985 decision dismissing Plaintiff's appeals (ECF No. 70-8) are no longer "final rulings" under the second prong of issue preclusion. Plaintiff's conviction was vacated through the grant of a post-conviction motion for new trial. (ECF No. 70-9.) Pursuant to NRS § 176.09187, where the results of a genetic marker analysis are favorable to a petitioner, the petitioner may bring a motion for new trial pursuant to NRS § 176.515. NRS § 176.09187(1)(a). Here, the state district court granted Plaintiff's post-conviction motion for a new trial on that basis and in the order explicitly vacated her conviction. (*See* ECF No. 70-9 at 2.) A new trial means just that — a do over such that rulings in the previous trial no longer apply and are therefore not "final rulings" for

---

[12]Plaintiff contends that this Court cannot take judicial notice of findings of fact, testimony or factual assertions for the truth of the matter asserted in another court's decision and may only take judicial notice of the existence of the decision. (ECF No. 77 at 16.) To be clear, here the Court takes judicial notice of the trial court and Nevada Supreme Court's decisions only so that it may identify the holdings as they relate to Plaintiff's claim under Count I of a coerced confession. The Court does not assume any findings in these decisions to be true or correct.

[13]Based on County Defendant's contentions, Dunlap was not present for the March 7th interview. (ECF No. 83 at 2, 3 n.2.)

purposes of issue preclusion. This is consistent with the order granting the new trial. The state district court's order did not limit the evidentiary purview of a new trial in granting Plaintiff's motion for one. The order granting the new trial did not provide that evidentiary rulings in the previous trial would apply; nor did it provide that Plaintiff could not raise evidentiary objections ruled upon in the prior trial. This means that if the County were to re-try Plaintiff for the murder of Mitchell, the earlier evidentiary rulings by the trial court, whether they were affirmed by the Nevada Supreme Court, would not preclude Plaintiff from raising the voluntariness of her confession again in a new trial.

Moreover, Plaintiff points out that in Nevada, criminal defendants cannot take an interlocutory appeal of a decision denying a motion to suppress, *see* NRS § 177.015(2) & (3), and instead may present evidence on and argue the voluntariness of her confession to the jury, *see Carlson v. State*, 445 P.2d 157, 159 (Nev. 1968) (stating that even where a trial court finds a confession to be voluntary, the jury is still "instructed that it must find that the confession was voluntary before [the confession] may be considered"). (ECF No. 77 at 22.) Similarly, the Nevada Supreme Court has ruled that the "doctrine of collateral estoppel is not concerned with interlocutory rulings," which is evidenced by a criminal defendant's inability to appeal a denial of a motion to suppress and ability to reargue involuntariness to the jury during trial. *See Bull v. McCuskey*, 615 P.2d 957, 960 (Nev. 1980), *overruled on other grounds by Ace Truck v. Kahn*, 746 P.2d 132 (1987). For this reason, the Court does not see why the earlier evidentiary ruling by the Nevada trial court would selectively apply to bar a claim in a civil suit based on an involuntary confession where Plaintiff's conviction was vacated.

Defendants cite to an unpublished Ninth Circuit decision, *Hall v. City of Los Angeles* (*Hall V*), 585 F. App'x 620 (9th Cir. 2014), as the primary basis for the argument that, because Plaintiff's conviction was not overturned on the basis of her confession being involuntary, that issue remains final. (See ECF No. 70 at 9-11.)[14] In

---

[14]County Defendants also cite to a decision from the Eastern District of Washington to support their argument that Plaintiff is collaterally estopped from *(fn. cont…)*

*Hall V*, the Ninth Circuit found on the case's third appeal after remand that the plaintiff's § 1983 claim that his confession was coerced was barred by issue preclusion. *Hall V*, 585 F. App'x at 621. As to the original criminal case, the plaintiff was convicted of murder in state court and had his conviction affirmed by the state supreme court, but the Ninth Circuit subsequently ordered that a writ of habeas corpus be granted on an issue distinct from the plaintiff's purportedly coerced confession. *Hall v. Dir. Of Corr.* (*Hall I*), 343 F.3d 976, 985 (9th Cir. 2003) (per curiam). For that reason, the Ninth Circuit found that the trial court's decision on voluntariness was "final" and no longer subject to direct appeal, meaning that the trial court's decision on that issue barred relitigation of the plaintiff's claim under 42 U.S.C. § 1983.

However, this Court finds *Hall V* distinguishable for several reasons. As a preliminary matter, *Hall V* is not precedent pursuant to Rule 36-3(a),[15] as it is an unpublished disposition from the Ninth Circuit Court of Appeals. Secondly, in *Hall I* the Ninth Circuit granted a writ of habeas corpus, which does not expressly vacate a conviction. Rather, a writ of habeas corpus itself is limited to the release of an individual who is unlawfully detained, *see Boumediene v. Bush*, 553 U.S. 723, 729 (2008), but often results in the granting of a new trial.[16] Thirdly, *Hall V* was based on the factors of

_____

*(…fn. cont.)*
relitigating the issue of the voluntariness of her confession; however, the court in that case based its decision on Washington law. (ECF No. 70 at 11 (citing *Bradford v. Scherschligt*, No. 13-cv-3012-TOR, 2014 WL 3105215, at *6 n.4 (E. D. Wash. July 7, 2014), *rev'd and remanded by Bradford v. Scherschligt*, 803 F.3d 382 (9th Cir. 2015)); *see also* ECF No. 77 at 24 (Plaintiff's opposition stating "Defendants' reliance on *Bradford v. Scherschligt* . . . is unavailing because it is unpublished, unpersuasive, and dealt with Washington, not Nevada law").)

[15]Defendants misconstrue Ninth Circuit Rule 36-3(a), which states that "unpublished dispositions and orders of [the Ninth Circuit] are not precedent, except when relevant under the doctrine of law of the case or rules of claim or issue preclusion," to mean that *Hall V*'s holding is precedent for purposes of Plaintiff's case because the holding addresses the law of issue preclusion. However, Rule 36-3(a) actually permits courts to use an unpublished Ninth Circuit decision that decided a specific issue between particular parties to be considered for purposes of issue preclusion in a subsequent action where the same parties (or their privies) attempt to relitigate that same issue.

[16]Where a motion for new trial is granted pursuant to a post-conviction motion, it is considered to be post-conviction relief that expressly vacates the original conviction *(fn. cont…)*

issue preclusion under California law, which do not apply to this case. *Hall V*, 585 F. App'x at 621. Finally, the procedural history leading up to *Hall V* is unique—the Ninth Circuit remanded the case to the district court on two prior occasions and the disposition cited to by Defendants is the ultimate appeal in the case. As a result, the unpublished disposition in *Hall V* does not fully capture the Ninth Circuit's reasoning as to why the plaintiff was precluded from bringing a section 1983 claim under the Fifth Amendment based on a coerced confession.

In *Hall I*, a Ninth Circuit panel addressed the plaintiff's habeas petition and overturned the plaintiff's conviction because of false evidence but declined to grant habeas relief on the plaintiff's assertion that his confession was coerced. 343 F.3d 976, 981 n.5 ("Hall also claims: . . . that his September 11, 1985, confession was coerced and involuntary . . . We have examined the record and find that [this claim is] without merit"). The plaintiff then filed a lawsuit for damages under 42 U.S.C. § 1983 against the city of Los Angeles, individual detectives of the Los Angeles Police Department ("LAPD"), and the LAPD as a whole. The district court ruled in favor of the defendants on summary judgment, and on appeal for the first time the Ninth Circuit found that the district court had erred in finding that the fifth footnote in *Hall I* prevented the plaintiff from arguing that the detectives used investigative techniques that were coercive and abusive, stating that "[w]hile the denial of habeas relief on a certain issue essential to a subsequent § 1983 claim *may* have preclusive effect for purposes of the § 1983 claim, . . . preclusive force only attaches to determinations that were necessary to support the panel's judgment in [*Hall I*]." *See Hall v. City of Los Angeles* (*Hall II*), No. 07-56853, 2009 WL 2020851, at *1 (9th Cir. July 13, 2009) (internal quotations, alterations, and

---

*(…fn. cont.)*
and, because it may result in a new trial, it wipes the slate clean such that no previous evidentiary findings apply in the new trial (unless indicated so by the trial court upon grant of the motion). The grant of a motion for new trial is therefore clearly part of the original case and not separate from it. By contrast, the writ of habeas corpus is a collateral attack on a conviction and, as such, has a limited scope of review that is outside of the original criminal case. *See Wall v. Kholi*, 562 U.S. 545, 551-52 (2011).

citation omitted). Then, on appeal for the second time, the Ninth Circuit permitted the plaintiff to amend his complaint to state a claim for a coerced confession under the Fifth Amendment. *Hall v. City of Los Angeles* (*Hall IV*), 697 F.3d 1059, 1073 (9th Cir. 2012). Finally, in the ultimate appeal, the Ninth Circuit found that the plaintiff's Fifth Amendment claim was precluded because the state trial court's decision on the voluntariness of his confession was "final" under California law *and* no proceedings subsequent to *Hall I* found the trial court's voluntary-confession decision to be erroneous or that the trial court had acted in a fundamentally unfair way. *See Hall V*, 585 F. App'x at 621. While in *Hall I* habeas relief by the Ninth Circuit was granted on an issue separate from the voluntariness of the plaintiff's confession—which Defendants contend weighs in favor of issue preclusion applying here—the Ninth Circuit's decision in *Hall I* intimated that it had considered the voluntariness of the plaintiff's confession and found it to have been voluntary. *Hall I*, 343 F.3d at 981 n.5. Thus, not only had the state trial court addressed the issue of voluntariness, but the Ninth Circuit had implicitly done so as well in granting habeas relief. As a result of the unique procedural posture of *Hall V,* the holding in that case is distinguishable from the circumstances of Plaintiff's case.

In sum, Defendants have not established the second prong of issue preclusion because the previous rulings were effectively vacated when the district court judge granted a new trial.

Issue preclusion is an equitable doctrine and should not apply where there is any doubt as to its application. *Durkin*, 92 F.3d at 1515. Applying these principles here, the Court declines to find that issue preclusion bars Plaintiff's claims. At best, it is unclear whether the state district court and Nevada Supreme Court's rulings remain final in the wake of Plaintiff's conviction being vacated through a grant of a new trial. Thus, this Court cannot definitively say that all elements of issue preclusion under Nevada law have been met. Moreover, because the SAC generally alleges that Defendants withheld pertinent, exculpatory facts from the state district court during Plaintiff's trials, this

weighs in favor of this Court's re-consideration of the issue. *See Montana v. United States*, 440 U.S. 147, 159 (1979) ("It is, of course, true that changes in facts essential to a judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues.").

The Court therefore finds that issue preclusion does not apply to bar Plaintiff's claims arising from an involuntary confession.

## V.    COUNTY DEFENDANTS' MTD (ECF No. 70)

County Defendants argue that the SAC should be dismissed pursuant to Rule 12(b)(6) and 12(c) because Dunlap is entitled to absolute prosecutorial immunity and the SAC's claims are insufficiently pled. (ECF No. 70 at 2.) Washoe County also argues that the claims against it are insufficiently pled. (*Id.* at 23-24.) Plaintiff responds that she is suing Dunlap in his capacity as an investigator, thereby exempting him from the protection of absolute immunity. (ECF No. 77 at 27-32.) The Court agrees that absolute immunity does not bar claims against Dunlap based on his role as an investigator. However, the Court finds that Plaintiff's claims of failure to intervene, conspiracy under both federal and state law, and claims based on respondeat superior and indemnification should be dismissed against Dunlap and Washoe County.

### A.    Absolute Immunity

Prosecutors are immune from liability for acts performed in the scope of their authority that are an "integral part of the judicial process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). However, prosecutorial immunity does not apply when the prosecutor acts as an investigator or administrator. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) ("There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand.") Courts take a functional approach when determining whether absolute immunity applies, focusing on the

///

conduct for which immunity is claimed and not on the harm that the conduct may have caused. *Id.* at 269, 271.

Certain allegations in the SAC concern Dunlap's conduct as an investigator and administrator.[17] For instance, based on the allegations in the SAC as well as Dunlap's own admission (*see* ECF No. 70 at 16), he was present for the March 8th interview of Plaintiff at LSU Medical Center and advised the investigating officers on how to conduct their interviews, both of which occurred prior to the establishment of probable cause. (ECF No. 77 at 27.) Moreover, the SAC includes allegations that Dunlap, with the other Defendants, provided a narrative of the events even though Plaintiff could not provide one and included non-public facts to make Plaintiff's confession seem more legitimate, all of which occurred during investigation of Plaintiff's purported admissions of guilt. (ECF No. 67 at ¶¶ 96-97.) Because these events occurred before a finding of probable cause and relate to Dunlap's conduct as an investigator and administrator, absolute prosecutorial immunity does not protect Dunlap from claims arising from these actions.[18]

Therefore, the Court finds that absolute immunity does not bar Plaintiff's claims against Dunlap insofar as they arise from his conduct as an investigator and administrator.

---

[17]To the extent "it may not be gleaned from the complaint whether the conduct objected to was performed by the prosecutor in an advocacy or an investigatory role, the availability of absolute immunity from claims based on such conduct cannot be decided as a matter of law on a motion to dismiss," and the proper course of action is to deny the motion to dismiss on the basis of absolute immunity while being subject to later determination based on the facts developed through discovery. *Hill v. City of New York*, 45 F.3d 653, 663 (2d Cir. 1995). Therefore, to the extent certain facts developed during discovery in this case give rise to a defense of absolute immunity regarding certain claims, Dunlap is not precluded from raising them.

[18]Dunlap insists that because a Fifth Amendment claim does not ripen until a coerced confession is used against a plaintiff in a criminal case, *see Stoot v. City of Everett*, 582 F.3d 910, 927 (9th Cir. 2009), his introduction of the contents of Plaintiff's confession through the calling of witnesses protects him from his earlier conduct in aiding in the coercion of this confession. (*See* ECF No. 70 at 16.) The Court is not persuaded. If the Court were to apply this reasoning to Plaintiff's Fifth Amendment claim then the cloak of absolute immunity for prosecutors could insulate them so long as they make sure to introduce the contents of involuntary confessions through the calling of witnesses, even when the prosecutor herself conducts the interrogation of the criminal defendant.

## B.    12(b)(6) Legal Standard

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A properly pleaded complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Rule 8 notice pleading standard requires Plaintiff to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.* (internal quotation marks and citation omitted). While Rule 8 does not require detailed factual allegations, it demands more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "Factual allegations must be enough to rise above the speculative level." *Twombly*, 550 U.S. at 555. Thus, to survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

In *Iqbal*, the Supreme Court clarified the two-step approach district courts are to apply when considering motions to dismiss. First, a district court must accept as true all well-pleaded factual allegations in the complaint; however, legal conclusions are not entitled to the assumption of truth. *Id.* at 678. Mere recitals of the elements of a cause of action, supported only by conclusory statements, do not suffice. *Id.* Second, a district court must consider whether the factual allegations in the complaint allege a plausible claim for relief. *Id.* at 679. A claim is facially plausible when the plaintiff's complaint alleges facts that allow a court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id.* at 678. Where the complaint does not permit the court to infer more than the mere possibility of misconduct, the complaint has "alleged — but it has not show[n] — that the pleader is entitled to relief." *Id.* at 679 (internal quotation marks omitted). When the claims in a complaint have not crossed the line from conceivable to plausible, the complaint must be dismissed. *Twombly*, 550 U.S. at 570. Moreover, a complaint must contain either direct or inferential allegations

25

concerning "all the material elements necessary to sustain recovery under *some* viable legal theory." *Id.* at 562 (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1989)).

### C. Failure to Plead Sufficient Facts against Dunlap

The Court agrees with Dunlap that Plaintiff's failure to intervene and conspiracy claims are insufficiently pleaded at this point in time. (ECF No. 70 at 21-22). The Court therefore dismisses these claims.[19] However, the Court finds that Plaintiff has pled sufficient facts as to her Fourth, Fifth and Fourteenth Amendment claims, malicious prosecution claim under federal and state law, abuse of process claim under state law,[20] and intentional infliction of emotional distress claim against Dunlap.

### 1. Due Process

Dunlap argues that Plaintiff's due process violation should be dismissed under *Devreaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) (en banc), and *Brady v. Maryland*, 373 U.S. 83 (1963), because Plaintiff fails to allege what evidence was fabricated, false or exculpatory. (ECF No. 70 at 16-18.) The Court disagrees.

Under *Devreaux*, a plaintiff may show a deliberate-fabrication-of-evidence claim in one of two ways:

///

---

[19]The Court declines to permit amendment at this point in time. Plaintiff may file a motion seeking leave to amend the SAC if evidence obtained during discovery demonstrates sufficient facts to state claims for failure to intervene and conspiracy against Dunlap.

[20]In their reply, County Defendants make reference to a prior decision of this Court, *Pierson v. Storey Cty.*, Case No. 3:12-cv-00598-MMD-VPC, for the proposition that the DNA evidence that led to the granting of a new trial for Plaintiff did not undermine prior judicial determinations regarding the voluntariness of Plaintiff's confession. (ECF No. 83 at 5.) However, the Court's decision in *Pierson*, which the Ninth Circuit affirmed in *Pierson v. Cty, of Storey*, 682 F. App'x 577 (9th Cir. 2017), dealt with the preclusive effect of a probable cause determination when criminal charges are subsequently dismissed for purposes of federal malicious prosecution and Nevada abuse of process claims. Because County Defendants failed to address whether these claims against Dunlap are precluded based on prior probable cause findings, this Court declines to address this issue in its order. Moreover, the Supreme Court's decision in *Manuel v. City of Joliet III*, 137 S. Ct. 911, 914 (2017), suggests that where a probable cause finding is based solely on fabricated evidence, this may weigh against expunging a plaintiff's Fourth Amendment claim.

> (1) Defendants continued their investigation of [plaintiff] despite the fact that they knew or should have known that [s]he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information.

263 F.3d at 1076. Dunlap argues that Plaintiff "does not set forth any facts suggesting that defendant Dunlap deliberately fabricated evidence against her or what that evidence may have been…[or] that defendant Dunlap knew or should have known she was actually innocent"; because he is not a medical doctor, he contends "[h]e would have had no way of knowing how [Plaintiff's] psychiatric condition affected her statements about Mitchell's murder[.]" (ECF No. 70 at 17.) He further contends that despite any conflict in the evidence, "[p]rosecutors must often decide whether to proceed with a criminal case where there is a conflict in the evidence." (*Id.* at 18.) As a result, Dunlap argues, Plaintiff fails to allege sufficient facts to state a claim under the first prong of *Devreaux*. In opposition, Plaintiff points to portions of the SAC that allege facts implying Dunlap knew or should have known of her innocence: (1) "[w]hen she was being questioned, Ms. Woods indicated that she did not have any personal knowledge about the Mitchell murder"; (2) the killer's shoeprints at the crime scene were more than two sizes larger than those of Plaintiff; (3) numerous witnesses on the night of the murder contemporaneously reported seeing a man, and Plaintiff does not look like the description of the suspect given by these witnesses; (4) the initial statement Plaintiff made to the LSU Medical Center counselor was vague and did not contain any information that had not been publicly reported; (5) Plaintiff was involuntarily committed, seeking psychiatric treatment for a severe mental illness when she was questioned. (ECF No. 77 at 32 (citing ECF No. 67 at ¶¶ 27-29, 34-42, 50-52, 56 58, 72-120).) Collectively, these facts permit the Court to draw a reasonable inference that Defendants knew or should have known of Plaintiff's innocence.[21]

---

[21]The Court declines to address whether Plaintiff has a claim under *Devreaux's* second prong based on the SAC's allegations. Because Plaintiff has generally stated a *Devreaux* claim, consideration of whether Plaintiff may bring that claim under the *(fn. cont…)*

As for Plaintiff's exculpatory evidence claim, Dunlap argues that Plaintiff "vaguely alleges that all of the defendants withheld exculpatory evidence from her and from state prosecutors" but that she "does not identify what this exculpatory evidence was or how it was prejudicial." (ECF No. 70 at 18.) In response, Plaintiff points to allegations in the SAC that "[t]he exculpatory evidence that Dunlap withheld includes the fact that [her] confession was fabricated, and that reports memorializing her confession[22] contained fabricated information." (ECF No. 77 at 31 (citing ECF No. 67 at ¶¶ 84-100.) She also contends that Dunlap was aware of these facts before he became an advocate for the state when he was doing "police-like investigative work." (*Id.* at 32.) The Court agrees with Plaintiff that these factual allegations are sufficient to state a claim pursuant to *Brady* for withholding of exculpatory evidence. *See Kyles v. Whitley*, 514 U.S. 419, 438 (1995) (finding that the *Brady* rule also applies to evidence "known only to police investigators and not to the prosecutor").

Therefore, the Court denies dismissal of Plaintiff's Fourteenth Amendment claim.

### 2. Malicious Prosecution under Federal and State Law

Federal courts apply the state law elements of a malicious prosecution claim. *Usher v. City of Los Angeles*, 828 F.2d 556, 562 (9th Cir. 1987). In Nevada, to state a claim for malicious prosecution the plaintiff must show: "(1) want of probable cause to initiate the prior criminal proceeding; (2) malice; (3) termination of the prior criminal proceedings; and (4) damages." *LaMantia v. Redisi*, 38 P.3d 877, 879 (Nev. 2002).

Dunlap argues that because the Reno Justice Court found that probable cause existed to initiate a criminal prosecution, Plaintiff "cannot reasonably argue that defendant Dunlap instituted the criminal action without probable cause when an

---

*(…fn. cont.)*
alternative theory of liability found in prong two is more appropriately addressed at the summary judgment stage based on the evidence developed during discovery.

[22]The SAC is unclear about how Plaintiff's purported confession was memorialized. (*See* ECF No. 67 at ¶ 96 ("Instead, in fabricating false evidence, the Law Enforcement Defendants later memorialized Ms. Woods' purported confession.")

independent tribunal upheld the finding of probable clause"[23] and that she "has failed to allege sufficient facts that would allow this Court to reasonably infer that defendant Dunlap fabricated Plaintiff's confession." (ECF No. 70 at 20; ECF No. 83 at 8.) In opposition, Plaintiff contends that "the fact that a court found probable cause after a preliminary hearing does not defeat [her] claim" because the probable cause finding was based on her fabricated confession and was the only thing that led to her prosecution. (ECF No. 77 at 38-39.) The Court agrees and finds that Plaintiff has alleged sufficient facts—addition of non-public facts to Plaintiff's confession—to state a claim for malicious prosecution.

The Court therefore denies dismissal of Plaintiff's malicious prosecution claims.

### 3. Failure to Intervene

"[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *United States v. Koon*, 34 F.3d 1416, 1447 n. 25 (9th Cir. 1994), *rev'd on other grounds*, 518 U.S. 81 (1996). "Importantly, however, officers can be held liable for failing to intercede only if they had an opportunity to intercede." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) (citation omitted).

Plaintiff argues that she "has alleged sufficient facts to show that Dunlap failed to intervene when the other Defendants violated Plaintiff's constitutional rights under the Fourth, Fifth, and Fourteenth Amendments."[24] (ECF No. 77 at 41.) She points to portions of the SAC where she alleged that "Dunlap, along with other Law Enforcement Defendants, coerced and fabricated Plaintiff's false confession, even though they had no evidence linking her to the crime and she did not match the description of the male suspect given by witnesses." (*Id.* (citing ECF No. 67 at ¶¶ 33-41, 57-120).) The issue

---

[23]*See supra* n.21.

[24]Plaintiff cites no authority for the proposition that a prosecutor acting in an investigative capacity can be held liable under a failure to intervene standard. The Court, however, assumes that a prosecutor may be held liable for failing to intervene when police officers commit constitutional violations for purposes of addressing this claim under a Rule 12(b)(6) standard.

with these allegations, however, is two-fold. First, Dunlap needed to be present in order to have an opportunity to intercede, and he appears to only have been present on the second day of interviewing Plaintiff. Second, because Plaintiff contends that Dunlap was participating alongside other officers in the committing of constitutional violations, it is factually implausible that he would intervene. In cases addressing claims for failure to intervene, the officer fails to intervene where other officers commit constitutional violations. If Dunlap himself fabricated evidence alongside Dennison, Ashley and Lewis, then he would not intervene to prevent himself and others from committing a constitutional violation. In fact, the only allegation in the SAC regarding an officer's failure to intervene concerns Defendants Ashley and Lewis. (ECF No. 67 at ¶ 69.)

The Court therefore dismisses this claim with prejudice against Defendant Dunlap.

### 4.    Conspiracy

Plaintiff pleads two conspiracy claims: one pursuant to 42 U.S.C. § 1983 for conspiracy to deprive Plaintiff of her constitutional rights and a second for civil conspiracy under Nevada law.

To establish a cause of action for conspiracy under § 1983, a plaintiff must allege facts sufficient to demonstrate: (1) the existence of an express or implied agreement among the defendant officers to deprive a person of her constitutional rights, and (2) an actual deprivation of those rights resulting from that agreement. *Avalos v. Baca*, 517 F. Supp. 2d 1156, 1166 (C.D. Cal. 2007) (citing *Ting v. United States*, 927 F.2d 1504, 1512 (9th Cir. 1991)). One can infer an agreement from the defendant's acts pursuant to the conspiratorial scheme or from other circumstantial evidence. *Id.* at 1170 (citing *Woodrum v. Woodward Co.*, 866 F.2d 1121, 1126 (9th Cir. 1989), and *United States v. Clevenger*, 733 F.2d 1356, 1358 (9th Cir. 1984).) Similarly, in Nevada, "[a]n actionable civil conspiracy consists of a combination of two or more persons who, by some concerted action, intend to accomplish an unlawful objective for the purpose of harming another, and damage results from the act or acts." *Consolidated Generator-Nevada,*

*Inc. v. Cummins Engine Co., Inc.*, 971 P.2d 1251, 1256 (Nev. 1998) (citing *Hilton Hotels v. Butch Lewis Productions*, 862 P.2d 1207, 1210 (Nev. 1993)) (internal quotation marks and citation omitted).

Dunlap argues that "Plaintiff does not allege sufficient facts to support [his] involvement in any other unlawful purpose or agreement to deny her constitutional rights" other than his criminal investigation following Plaintiff's spontaneous confession to medical doctors that she killed a woman in Reno several years earlier. (ECF No. 70 at 22.) Plaintiff contends that she has provided specific allegations of conspiracy by alleging that: "Dennison, Ashley, Dunlap, Lewis, and Detective Kimpton consulted with one another about the interrogations and how they would be conducted"; "Dunlap supervised the interrogations, provided advice, and coordinated with the other Defendants on the manner in which the interrogations would be conducted"; that the "unlawful objective of the Defendants was to obtain what they knew to be a false and fabricated confession and denying [Plaintiff] a fair trial"; and Defendants "together observed [Plaintiff's] cognitive deficiencies and fabricated her false confession, including by adding non-public facts." (ECF No. 77 at 41 (quoting ECF No. 67 at ¶¶ 67, 71, 83-84, 86-100).)

The Court finds that Plaintiff fails to allege sufficient facts to show that there was an agreement or meeting of the minds between Dunlap and the individual Defendants to fabricate Plaintiff's confession so as to deprive her of her constitutional rights. The Supreme Court's decision in *Twombly* proves instructive here. In *Twombly*, the Court found that the complaint's allegations that (1) the defendants "had entered into a contract, combination or conspiracy to prevent competitive entry… and had agreed not to compete with one another" and that (2) the defendants' "parallel course of conduct . . . to prevent competition" and inflate prices indicated an unlawful agreement amongst the defendants were insufficient to withstand Rule 12(b)(6). 550 U.S. at 551. The Court held that it was not required to assume as true a contention that the defendants had entered into an unlawful agreement, as it amounted to a mere legal conclusion, and that

factual allegations of parallel behavior were compatible with free-market behavior, not necessarily conspiracy. *Id.* at 567. "Because the well-pleaded fact of parallel conduct, accepted as true, did not plausibly suggest an unlawful agreement, the Court held the plaintiff's complaint must be dismissed." *Iqbal*, 556 U.S. at 680 (citing *Twombly*, 550 U.S. at 570).

Here, even assuming as true Dunlap consulted and advised the individual Defendants as to the interview of Plaintiff, this is insufficient to state a plausible claim for relief that he was working collaboratively and of one mind with Defendants in depriving Plaintiff of her constitutional rights. While the purported addition of non-public facts— which the Court must assume as true—to Plaintiff's confession itself may be considered an overt act in furtherance of a conspiracy, it is insufficient on its own to demonstrate that Dunlap had even an implicit agreement with the other Defendants to deprive Plaintiff of her constitutional rights.[25] Moreover, the SAC fails to address the fact that Louisiana Defendants were not officially a part of RPD at the time of the Mitchell murder and, therefore, their knowledge of non-public facts would also be limited unless Dennison, Dunlap, and/or Kimpton provided them with these facts before, during, or after the March 7 and 8 interviews. However, there are no allegations in the SAC that Dunlap, Dennison or Lewis provided Louisiana Defendants with non-public facts; as such, it is unclear how Louisiana Defendants knowingly added non-public facts to Plaintiff's confession in furtherance of an agreement with the other individuals.

In addition, other allegations in the SAC of acts in furtherance of the conspiracy may be explained by things other than an unlawful agreement amongst Defendants. For instance, the SAC's allegation that individual Defendants reviewed and edited one another's police reports (*see* ECF No. 67 at ¶ 65) is an act that is compatible with good

---

[25]The Court also finds this allegation to be far too vague to support Plaintiff's contention of an unlawful agreement amongst individual Defendants. For instance, it is unclear from the SAC which individual Defendants added non-public facts, what these non-public facts were, and where these facts were added (i.e., in a police report or in testimony at a hearing or at trial).

police work, and the Court is not required to assume that the purpose of reviewing and editing one another's police reports was to ensure that each officer's report included non-public facts about the murder of Mitchell (which were attributed to Plaintiff). Similarly, the contentions that individual Defendants knew that Plaintiff had invoked her right to counsel between the March 7th and 8th interviews yet failed to inform Plaintiff of her *Miranda* rights and questioned her anyways (*see id.* at ¶¶ 78-79, 81-82, 104-105) is not indicative of an agreement amongst Defendants to deprive Plaintiff of her constitutional rights and can be explained by other things, such as poor training by the Reno or Shreveport police departments, Defendants' lack of knowledge about mental health, a misunderstanding of fact, and/or a misapplication of law to Plaintiff's factual circumstances. Thus, assuming all these factual allegations as true and as circumstantial evidence of an agreement amongst Defendants, they are insufficient to state a claim for conspiracy to deprive Plaintiff of her constitutional rights for which relief may be granted.

The Court therefore dismisses the conspiracy claims against Dunlap without prejudice.

### 5. Abuse of Process Claim

In Nevada, the elements of an abuse of process claim are: "(1) an ulterior purpose by the defendants other than resolving a legal dispute, and (2) a willful act in the use of the legal process not proper in the regular conduct of the proceeding." *LaMantia*, 38 P.3d at 879.

County Defendants contend that Plaintiff's claim for abuse of process should be dismissed because she "has failed to allege how Defendant Dunlap used the legal process in an improper manner 'in the regular conduct of the proceeding.'" (ECF No. 70 at 23.) Plaintiff responds that the probable cause finding at the preliminary hearing of the first trial and the prosecution in 1985 are the result of the false and fabricated evidence that Dunlap created and provided to the prosecutors at the second trial. (ECF No. 77 at 42; *see also* ECF No. 67 at ¶ 182 ("Defendants, acting as investigators

individually, jointly, and in conspiracy with each other, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause of doing so and in spite of the fact that they knew Plaintiff was innocent").) The Court agrees.

The Court therefore denies dismissal of Plaintiff's abuse of process claim.

### 6. Intentional Infliction of Emotional Distress

In order to succeed on a claim for intentional infliction of emotional distress under Nevada law, a plaintiff must demonstrate: (1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme emotional distress, and (3) actual and proximate causation. *Star v. Rabello*, 625 P.2d 90, 91-92 (Nev. 1981).

Dunlap contends that Plaintiff "has failed to plead sufficient facts to infer that [his] actions were extreme or outrageous in any manner." (ECF No. 70 at 23.) However, Plaintiff responds, and the Court agrees, that "Defendant Dunlap and the other Defendants' coercion and fabrication of a false confession . . . which resulted in Ms. Woods' wrongful conviction and imprisonment for her entire adult life, was 'extreme and outrageous conduct.'" (ECF No. 77 at 43 (citing ECF No. 67 at ¶¶ 50-100).) Assuming to be true that Defendant fabricated Plaintiff's confession by adding non-public facts to statements she made during her interviews with individual Defendants, this conduct is particularly outrageous in light of Plaintiff's supposed mental condition and involuntary confinement in March of 1979. *See Tarr v. Narconon Fresh Start*, 72 F. Supp. 3d 1138, 1142 (D. Nev. 2014) (Extreme and outrageous conduct "may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests.").

The Court therefore denies dismissal of Plaintiff's intentional infliction of emotional distress claim.

///

///

### D. Failure to Plead Sufficient Facts against the County

A municipality cannot be held liable under 42 U.S.C. § 1983 based on a theory of respondeat superior. *See Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658, 694 (1978). Municipal liability may exist where the municipality itself causes the constitutional violation through "execution of a government's policy of custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* To establish liability under *Monell*, Plaintiff must demonstrate that she was deprived of a constitutional right, that the County had a policy that amounted to deliberate indifference to Plaintiff's right, and that the County's policy was the moving force behind the constitutional violation. *See Dougherty v. City of Corvina*, 654 F.3d 892, 900 (9th Cir. 2011). For instance, a plaintiff may be able to establish municipal liability if she can show that the constitutional violation that harmed her was committed "pursuant to an expressly adopted official policy, a long-standing custom or practice, or the decision of a 'final policymaker.'" *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1066 (9th Cir. 2013) (quoting *Delia v. City of Rialto*, 621 F.3d 1069, 1081-82 (9th Cir. 2010)).

The County argues that Plaintiff has failed to sufficiently plead a claim of municipal liability because "[s]he has failed to identify any unlawful Washoe County policy, custom or practice which would condone unconstitutional coerced confessions, fabrication of evidence, suppression of exculpatory evidence, or any conspiracy with non-County actors to do so." (ECF No. 70 at 24.) The only allegation of such, the County argues, is Plaintiff's contention that constitutional violations were committed against her "with knowledge or approval of persons with final policymaking authority for the Country, or were actually committed by persons with final policymaking authority, such as Defendant Dunlap." (ECF No. 70 at 24 (quoting ECF No. 67 at ¶ 168).)

Plaintiff responds that she has pleaded adequate facts to state a claim against Washoe County because Dunlap was a final policymaker for Washoe County as the District Attorney for the County for criminal prosecutions. (ECF No. 77 at 48.) She argues that because "'a single decision by a municipal policymaker may be sufficient to

trigger section 1983 liability under *Monell*[] even though the decision is not intended to govern future situations[,]'" Dunlap's "unconstitutional acts of coercing and fabricating Plaintiff's false confession" are sufficient to state a claim for municipal liability against the County itself. (*Id.* at 48-49 (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir. 1992).) However, in order to give rise to municipal liability for violations of Plaintiff's constitutional rights, Dunlap would need to make a final decision regarding the use of this evidence at trial—as the constitutional violations occurred only through the use of the fabricated confession—which is protected under absolute prosecutorial immunity. *See Milstein v. Cooley*, 257 F.3d 1004, 1008-09 (9th Cir. 2001) (citing *Imbler*, 424 U.S. at 416) (A prosecutor's introduction of evidence at trial is subject to absolute prosecutorial immunity even where the prosecutor knowingly allows false testimony to be introduced.)

As the County Defendants point out, Plaintiff does not allege that Dunlap produced false evidence at trial, such as police reports, which were then introduced at trial; rather, the only way Plaintiff's confession was admitted—as it was not audio-recorded or memorialized and signed (*see* ECF No. 77 at 34)—was to "introduce the testimony of Lt. Dennison, Det. Ashley, and other individuals who were present during the March 1979 interviews to testify as to what plaintiff had reported during her confessions." (ECF No. 83 at 7-9.) Regardless, Dunlap's final decisions as a policymaker for the County that would give rise to a constitutional violation stem from the decision to use certain evidence at trial. Even assuming Dunlap had fabricated police reports or helped to fabricate the officers' testimony at trial about Plaintiff's purported confession, these decisions are protected.

The Court therefore finds that Dunlap's "final decisions" regarding any investigative acts he took, including the purported decision to help officers fabricate or coerce a confession, were not made in his role as a final decisionmaker.[26] The alleged

---

[26]This appears to be the catch 22 of arguing for section 1983 liability against Dunlap based on his role as an investigator but basing the County's municipal liability *(fn. cont…)*

constitutional violations Plaintiff suffered that would give rise to municipal liability resulted from Dunlap's conduct as a prosecutor.[27]

Therefore, the claims against the County based on respondeat superior and indemnification[28] are dismissed.

## VI.    RENO DEFENDANTS' MTD (ECF No. 73)

City Defendants argue that Plaintiff's federal civil rights claims are barred by qualified immunity. The Court, however, finds that accepting the SAC's allegations as true qualified immunity does not bar Plaintiffs' claims. City Defendants further argue the SAC fails to allege facts sufficient to state a claim against Dennison or the City. The Court's rulings as to the claims against Dunlap apply to the claims against Dennison. As for the City, the Court finds the SAC states a claim based on respondeat superior and indemnification.

### A.    Qualified Immunity

"To make out a cause of action under section 1983, plaintiffs must plead that (1) the defendants acting under color of state law (2) deprived plaintiffs of rights secured by the Constitution or federal statutes." *Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986). However, the doctrine of qualified immunity protects government officials

---

*(…fn. cont.)*
on his role as final policymaker in criminal prosecutions. Any constitutional violation by the County for purposes of *Monell* liability arises from a final decision by the district attorney to use the fabricated evidence against the plaintiff, and any "final" decision Dunlap may have made to fabricate a confession in his role as an investigator necessarily required that he step outside his role as a final policymaker for the County.

[27]Plaintiff contends that she was detained from 1980 to 1985 without probable cause because of Dunlap's actions as an investigator and administrator in fabricating her confession (*see* ECF No. 77 at 36), and that this fabricated evidence also resulted in the continuation of a second trial by a different prosecutor. However, the decision to fabricate or coerce a confession or consult with officers about how to do so was in Dunlap's role as an investigator and administrator, not as a final policymaker for the County.

[28]Plaintiff asks the Court to deny the indemnification claim without prejudice if this Court determines it is premature. (ECF No. 77 at 49.) Because the Court finds that the County may not be found liable on a basis of respondeat superior for Dunlap's actions as a final policymaker, there is no reason to preserve the indemnification claim against the County.

"from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Generally, courts apply a two-step analysis to determine whether qualified immunity applies to bar certain claims. First, a court decides whether the facts as alleged make out a violation of a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *holding modified by Pearson v. Callahan*, 555 U.S. 223 (2009). Second, the court decides whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Id.* Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

Dennison does not dispute that the allegations in the SAC make out a violation of Plaintiff's constitutional rights or that these rights were clearly established at the time Dennison purportedly coerced and fabricated Plaintiff's confession. Instead, Dennison argues that he was justified in believing his actions were constitutional because he "did nothing with regard to the Woods investigation until he first received legal advice [from Dunlap] on how to proceed." (ECF No. 73 at 11.) As Plaintiff points out, Dunlap did not act as Dennison's legal counsel in carrying out the interviews and initial investigation of Plaintiff, and the allegations in the SAC concern Dennison and Dunlap acting in concert, not Dennison acting at the behest of Dunlap. (ECF No. 77 at 45.) Moreover, the Court agrees with Plaintiff that "[n]o reasonable officer in Dennison's position could have believed that it was constitutional to fabricate an innocent person's false confession, even if a lawyer . . . was working together with him to do it." (*Id.* at 46.) Because Dennison does not allege that there were extraordinary circumstances surrounding the purported coercion and fabrication of Plaintiff's confession or that he "neither knew nor should have known of the relevant legal standard," *see Harlow*, 457 U.S. at 819, the Court fails to find that qualified immunity applies to bar the claims as alleged in the SAC against Dennison.

## B.    Failure to State a Claim against Dennison

City Defendants contend that Plaintiff's "allegations remain remarkably devoid of factual content . . ., which content is necessary to pass the plausibility test [under *Iqbal*]." (ECF No. 73 at 12.) Defendants go on to take issue specifically with the generality in which the SAC describes Dennison's actions and the manner in which Plaintiff lumps all the defendants in this action together. (*Id.* at 12-13 ("Plaintiff fails to identify or specify particular acts or omissions in which Dennison was allegedly involved"; "Plaintiff dilutes her allegations even more by peppering in meaningless references, such as 'possibly others' . . 'anyone, including any of the Defendants' . . . and 'other co-conspirators, known and unknown'").) Plaintiff responds merely that Dennison has pointed to no case law that states Plaintiff is not permitted to group Defendants together collectively when describing their purported misconduct. (ECF No. 77 at 47-48.)

Relying on its prior analysis, *see* discussion *supra* Sec. V.C(iii), the Court agrees with Dennison that the failure to intervene[29] and conspiracy claims are based on vague or problematic allegations that currently amount to nothing more than "unadorned, the-defendant-unlawfully-harmed-me'" accusations that attempt to state the basic elements of each cause of action. *See Iqbal*, 556 U.S. at 678. However, Plaintiff is not necessarily required to provide detailed factual allegations regarding each individual Defendant's actions. *See Twombly*, 550 U.S. at 555. It is enough that Plaintiff pleads general facts— such as Dennison adding non-public facts to Plaintiff's purported confession, the circumstances of Plaintiff's psychological state at LSU Medical Center when she was questioned by Dennison, and the subsequent use of Plaintiff's purported statements at her probable cause hearing and at her subsequent trials—to permit this Court to draw

---

[29]The manner in which the failure to intervene claim has been pleaded is generally problematic because Plaintiff alleges that Dunlap, Dennison, Ashley and Lewis acted in unison—in fact, she contends they collectively conspired—to violate Plaintiff's constitutional rights by coercing and fabricating a confession. The other officers would need to act independently of Dennison in order for Dennison to have failed to intervene to prevent their purported misconduct.

the reasonable inference that Dennison is liable for the misconduct alleged. *See Iqbal*, 556 U.S. at 678.

Therefore, Dennison's motion to dismiss is denied as to all claims except for Plaintiff's claims for failure to intervene and conspiracy under federal and Nevada law.

### C. Failure to State a Claim against the City

The City makes two arguments regarding the sufficiency of the SAC.

First, the City contends that the *Monell* claims against it merely allege unconstitutional City policies while completely lacking any factual content and that the same exact non-specific allegations are made against the County "in a flagrant demonstration of the lack of factual content . . . against the government entities." (ECF No. 73 at 13.) As stated previously, a *Monell* claim for municipal liability under section 1983 requires a plaintiff to allege (1) she was deprived of a constitutional right, (2) that the County had a policy that amounted to deliberate indifference to that plaintiff's right, and (3) this policy was the moving force behind the constitutional violation. *See Dougherty*, 654 F.3d at 900. In the SAC, Plaintiff alleges that "Defendant City did not have adequate rules, regulations, policies, and procedure governing questioning of criminal suspects, questioning of mentally ill suspects, in court testimony, preparation and presentation of witness testimony, preservation and disclosure of investigative materials and evidence, and training, supervision, and discipline of employees and agents of the Defendant City." (ECF No. 67 at ¶ 163.) The SAC also states that the City—specifically leaders, supervisors, and policymakers—were aware of, deliberately indifferent to, and/or encouraged the use of false evidence, deprivation of exculpatory evidence, forcing of involuntary inculpatory statements, and lack of probable cause in criminal proceedings where "individuals were implicated in crimes to which they had no connection and for which there was scant evidence to suggest that they were involved." (*Id.* at ¶¶ 164-66.) Based on these factual allegations concerning the specific City policies or lack thereof that were in place when Plaintiff's confession was allegedly obtained and used against her, this Court is capable of drawing a reasonable inference

that these policies were the moving force behind Plaintiff's constitutional violations under the Fourth, Fifth, and Fourteenth Amendments.

Second, the City contends that because Dennison is the only party through whom Plaintiff's federal claims may be brought against the City, and because Dennison did not violate Plaintiff's constitutional rights, it follows there are no grounds for asserting liability against the City. (ECF No. 73 at 11.) However, this Court has found that qualified immunity and Rule 12(b)(6) do not bar Plaintiff's claims against Dennison for violations of Plaintiff's Fourth, Fifth, and Fourteenth Amendment rights as well as her claims of malicious prosecution under federal and state law, abuse of process under Nevada law, and intentional infliction of emotional distress under Nevada law.

Thus, the Court denies dismissal of the claims against the City of respondeat superior and indemnification.

## VII. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the parties' motions.

It is therefore ordered that Defendants Ashley and Lewis's Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction (ECF No. 72) is denied.

It is further ordered that Defendants Calvin Dunlap and Washoe County's Motion to Dismiss (ECF No. 70) is granted in part and denied in part.

It is further ordered that Defendants City of Reno and Dennison's Motion to Dismiss (ECF No. 73) is granted in part and denied in part.

It is further ordered that Washoe County is dismissed from this action.

DATED THIS 18th day of January 2018.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE