UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

CATHY WOODS (a/k/a ANITA CARTER),
by and through her Personal
Representative, LINDA WADE,

                        Plaintiff,

    v.

CITY OF RENO, NEVADA, *et al.*,

                        Defendants.

Case No. 3:16-cv-00494-MMD-DJA

ORDER

## I.   SUMMARY

Plaintiff Cathy Woods served 35 years in prison for a murder conviction that was vacated due to DNA evidence. Woods claims that Defendants caused her to be wrongfully imprisoned. Before the Court are three substantive motions: (1) Defendants City of Reno and Lawrence C. Dennison's (collectively, "Reno Defendants") motion for summary judgment ("Reno Defendants' Motion") (ECF No. 206); (2) Defendants Clarence "Jackie" Lewis and Donald W. Ashley's (collectively, "Louisiana Defendants") motion for summary judgment ("Louisiana Defendants' Motion") (ECF No. 216); and (3) Plaintiff's motion for leave to file sur-reply on the summary judgment motions ("Sur-reply Motion") (ECF No. 262).[1] For the reasons discussed below, the Court denies the Sur-Reply Motion and grants in part and denies in part the summary judgment motions.

## II.   BACKGROUND

The following facts are undisputed unless noted otherwise.

Cathy Woods (also known as Anita Carter) lived in Reno, Nevada from 1969 to

---

[1]The Court has reviewed the parties' respective responses (ECF Nos. 238, 264, 265) and replies (ECF Nos. 256, 257, 266).

1    1977, working as a bartender and manager for various bars in the area. (ECF No. 206-2
2    at 50, 51, 54, 147.) While in Reno, a friend named Melody Lounsberry that Plaintiff knew
3    from work died of a drug overdose. (ECF No. 206-2 at 151-152.)

4    On February 24, 1976, the car of Michelle Mitchell, a 19-year-old University of
5    Nevada student, broke down near the Reno campus. (ECF No. 208-1 at 2-3.) She used a
6    pay phone to call her mother to come pick her up. (*Id.*) When her mother arrived, Mitchell
7    was not there. (*Id.*) Mitchell's body was subsequently found in the garage of a house near
8    the campus, with her hands tied behind her and her throat slashed. (*Id.* at 33-34; ECF No.
9    224-20 at 26, 28.)

10   The following year, Plaintiff moved to Shreveport, Louisiana, and lived with her
11   mother Elenora Carter. (ECF No. 206-2 at 56, 58.) In February 1979, Plaintiff was
12   involuntarily committed in connection with a drug overdose at the Louisiana State
13   University Medical Center in Shreveport, Louisiana ("LSU Medical Center"). (ECF No. 218-
14   1 at 44; ECF No. 215-4 at 21.) While at LSU Medical Center, Plaintiff was diagnosed with
15   chronic schizophrenia. (ECF No. 215-4 at 21.)

16   Plaintiff told Linda Whatley, a nurse at LSU Medical Center, that she had killed
17   someone. (ECF No. 215-4 at 36; ECF No. 224-21 at 19, 47.) Carol Moloney (formerly
18   named Sherman), an institutional counselor at LSU Medical Center, documented that
19   Plaintiff "told several staff members about a crime she says she committed 3 yr [sic] ago,"
20   and Douglas Burks, a medical student, documented that Plaintiff "spoke of a grave act she
21   committed while in Nevada." (ECF No. 215-4 at 37-38.) Dr. Flemenbaum, an attending
22   psychiatrist at LSU Medical Center, told Moloney to "check this out." (*Id.* at 37; ECF No.
23   206-12 at 8, 19; ECF No. 218-1 at 104-105.) Moloney contacted Shreveport police
24   detective Donald Ashley. (ECF No. 215-4 at 37.) Ashley then contacted the Reno Police
25   Department ("RPD"), who told him that there was an unsolved homicide that fit "that
26   general information." (ECF No. 206-22 at 160.)

27   Dennison, an RPD officer, traveled to Louisiana to interview Plaintiff. (ECF No. 206-
28   17 at 67.) On March 7, 1979, Dennison interviewed Plaintiff in a room at LSU Medical

1    Center with only Ashley and Burks present. (ECF No. 206-16 at 4.) Plaintiff was not given

2    *Miranda*[2] warnings before the interview. (ECF No. 235-16 at 89.) During this interview,

3    Plaintiff told Dennison that the knife she used to kill a woman in Reno with was at her

4    home in Shreveport. (ECF No. 243-4 at 13.)[3] Dennison, with assistance from Ashley,

5    dictated a report describing that interview ("Investigation Report"). (ECF No. 206-21; ECF

6    No. 224-24 at 9.) Dennison also prepared another report containing additional details

7    about the interview ("Specific Information Report"). (ECF No. 224-11.)

8        Dennison submitted a signed affidavit to obtain a search warrant to search Plaintiff's

9    mother's home ("Search Warrant Affidavit"). (ECF No. 224-8.) Washoe County District

10   Attorney Calvin Dunlap and RPD Detective John Kimpton also arrived to assist with the

11   investigation. (ECF No. 206-17 at 23-24; ECF No. 224-15 at 26-27.) Dennison, Ashley,

12   Dunlap, Kimpton, and Lewis (a Shreveport officer), attended the search of Plaintiff's

13   mother's home on March 8, 1979. (ECF No. 224-13 at 6.) Ashley and Lewis both drafted

14   reports describing the search (respectively "Ashley's March 8 Report" and "Lewis' March

15   8 Report"). (ECF Nos. 224-6, 224-7.) After the search, Plaintiff stated that she wanted an

16   attorney. (ECF No. 206-19 at 41-43.) The following day, Lewis and Kimpton returned to

17   the house to question Plaintiff's mother about Plaintiff's activities in Reno and

18   photographed a butcher knife from the kitchen—Lewis drafted a report describing these

19   activities ("Lewis' March 9 Report"). (ECF No. 224-12.)

20       Dennison later drafted an affidavit for an arrest warrant and criminal complaint

21   against Plaintiff ("Arrest Warrant Affidavit"). (ECF No. 224-15 at 19-29.) Plaintiff was

22   extradited to Reno. (*Id.* at 54.) In 1980, she was tried and convicted for the murder of

23   Mitchell and sentenced to life without the possibility of parole. (ECF No. 236-5.) This

24   conviction was subsequently overturned. (*Id.*) In 1985, Plaintiff was then tried and

25

26 ─────────────────

27       [2]*Miranda v. Arizona*, 384 U.S. 436 (1966).

28       [3]Plaintiff admitted this fact in her response to Defendant Dunlap's second set of requests for admission. (ECF No. 243-4 at 13.) Magistrate Judge Daniel J. Albregts denied Plaintiff's motion for leave to amend to change this admission. (ECF No. 263.)

1   convicted a second time for the murder of Mitchell and again sentenced to life in prison

2   without the possibility of parole. (*Id.*)

3        Ultimately, nearly 30 years later, Plaintiff's conviction was vacated as a result of

4   DNA evidence that linked a man named Rodney Halbower to the crime. (ECF No. 236-6

5   at 10-12; ECF No. 236-9.) The remaining charges against Plaintiff were later dismissed at

6   the request of the State of Nevada, and the State publicly declared that Plaintiff did not

7   commit the crime. (ECF No. 236-7; ECF No. 236-5.)

8        Plaintiff initiated this action through her personal representative Linda Wade. (ECF

9   No. 1.) Plaintiff asserts five claims for violations of her constitutional rights under 42 U.S.C.

10   § 1983: (1) involuntary confession in violation of the Fifth and Fourteenth Amendments;

11   (2) due process violation under the Fourteenth Amendment; (3) federal malicious

12   prosecution in violation of the Fourth and Fourteenth Amendments; (4) failure to intervene;

13   and (5) conspiracy to deprive constitutional rights. (ECF No. 170 at 30-38.) She also

14   asserts five claims for violations of Nevada laws: (1) abuse of process; (2) intentional

15   infliction of emotional distress ("IIED"); (3) civil conspiracy; (4) respondeat superior; and

16   (5) indemnification. (*Id.* at 38-41.)[4]

17   **III.   LEGAL STANDARD**

18        "The purpose of summary judgment is to avoid unnecessary trials when there is no

19   dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

20   F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when the pleadings,

21   the discovery and disclosure materials on file, and any affidavits "show that there is no

22   genuine issue as to any material fact and that the moving party is entitled to a judgment

23   as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is

24   "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could

25   find for the nonmoving party and a dispute is "material" if it could affect the outcome of the

26

27   _____

28        [4]Plaintiff has abandoned her state law malicious prosecution claim. (ECF No. 238 at 73 n.26.)

suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *See id.* at 250-51. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (*quoting First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

The moving party bears the burden of showing that there are no genuine issues of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 783 (9th Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.

## IV.    MOTION FOR LEAVE TO FILE SUR-REPLY (ECF NO. 262)

Plaintiff requests leave to file a sur-reply, asserting that Reno and Louisiana Defendants argue for the first time in their replies that the Court should not consider any of Plaintiff's testimony, and that Louisiana Defendants' reply raises new arguments on Plaintiff's Fifth Amendment claims. (ECF No. 262 at 3.)

"Courts in this district routinely interpret Local Rule 7-2 to allow filing of surreplies only by leave of court, and only to address new matters raised in a reply to which a party

1   would otherwise be unable to respond." *FNBN-RESCON I LLC v. Ritter*, No. 2:11-CV-

2   1867-JAD-VCF, 2014 WL 979930, at *6 (D. Nev. Mar. 12, 2014) (citation omitted).

3   Plaintiff's motion does not meet this standard.

4          Reno and Louisiana Defendants' arguments were not new and were properly raised

5   in response to Plaintiff's arguments. Throughout Plaintiff's response, she cites to her own

6   deposition testimony as proof that there are disputed issues of material fact regarding

7   several of her claims. (*See e.g.*, ECF No. 238 at 19, 23-29, 33, 35, 38-39.) Louisiana and

8   Reno Defendants responded that the Court should not consider her testimony because it

9   is contradictory. (ECF No. 256 at 6; ECF No. 257 at 2-6.)[5] Similarly, the Fifth Amendment

10  arguments Louisiana Defendants made in their reply were raised in response to

11  arguments Plaintiff made. (*Compare* ECF No. ECF No. 238 at 75-77 *with* ECF No. 257 at

12  10 n.36.) In both instances, Plaintiff had an opportunity to anticipate opposing arguments

13  and proactively respond. The Court therefore denies Plaintiff's Sur-Reply Motion.

14  **V.    MOTIONS FOR SUMMARY JUDGMENT (ECF NOS. 206, 216)**

15         Reno and Louisiana Defendants raise overlapping arguments in their respective

16  motions—they assert qualified immunity on Plaintiff's Section 1983 claims and rely on

17  similar arguments to contend they did not violate Plaintiff's state law rights. (ECF Nos.

18  206, 216.) Reno Defendants independently assert that the City of Reno is immune from

19  liability. (ECF No. 206 at 22-23.) Accordingly, the Court will address Reno and Louisiana

20  Defendants' Section 1983 and state law arguments collectively and the City of Reno's

21  liability separately. The Court will first address Louisiana Defendants' request that this

22

23         [5]Reno and Louisiana Defendants urge the Court to disregard Plaintiff's deposition
    testimony, arguing that it cannot raise a genuine issue of material fact because it is
24  contradictory and inconsistent—Plaintiff testified that Dennison and Ashley asked her
    leading questions, suggested answers, and fabricated her statements, but also testified
25  that she could not remember the questions asked during the interview or her responses
    to those questions. (ECF No. 256 at 6; ECF No. 257 at 2-6.) After reviewing the testimony,
26  it is not "clear and unambiguous" that Plaintiff's responses are so inconsistent that no
    reasonable jury could credit them. *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th
27  Cir. 2009). Accordingly, the attacks on Plaintiff's memory are credibility determinations
    that are properly reserved for trial. *See Foster v. Metro. Life Ins. Co.*, 243 F. App'x. 208,
28  210 (9th Cir. 2007) (stating that the credibility of plaintiff's statements was "fair game for
    cross-examination and a decision by a jury").

1   Court reconsider its earlier finding that it has personal jurisdiction over them.

2         **A.**   **Personal Jurisdiction**

3         Louisiana Defendants "re-urge" the Court to consider their personal jurisdiction

4   arguments raised in their motion to dismiss (ECF No. 72). (ECF No. 216 at 12-13; *see*

5   *also* ECF No. 101 at 6-16.) Louisiana Defendants insist that the evidence now shows that

6   they were not as involved as Plaintiff alleges, that their assistance to the Reno officers

7   ended before Plaintiff's indictment, arrest, or extradition, and that based on this evidence

8   this matter now resembles *Walden v. Fiore*, 571 U.S. 277 (2014). (ECF No. 216 at 13.)

9   There, the Supreme Court held that a Nevada federal court had no personal jurisdiction

10  over a Georgia police officer who seized cash from plaintiffs in Atlanta and helped draft a

11  false affidavit to show probable cause for forfeiture of the funds, because the officer lacked

12  "minimal contacts with Nevada . . .." *Walden*, 571 U.S. at 288.

13        However, Louisiana Defendants fail to identify what specific facts have changed

14  since the Court's order or how any facts now support their analogy to *Walden*. Louisiana

15  Defendants' conclusory statements regarding proffered new evidence do not provide a

16  valid reason for the Court to effectively reconsider its earlier finding of personal jurisdiction

17  over them. *See Frasure v. United States*, 256 F. Supp. 2d 1180, 1183 (D. Nev. 2003) (A

18  motion to reconsider must set forth "some valid reason why the court should reconsider

19  its prior decision" and set "forth facts or law of a strongly convincing nature to persuade

20  the court to reverse its prior decision").

21        **B.**   **Qualified Immunity**

22        Reno Defendants argue that they are entitled to qualified immunity on all of

23  Plaintiff's Section 1983 claims. (ECF No. 206 at 16-17.) Louisiana Defendants assert that

24  they are entitled to qualified immunity only on Plaintiff's Fifth Amendment involuntary

25  confession, Fourteenth Amendment due process, and failure to intervene claims. (ECF

26  No. 216 at 16-17, 20-23, 28.)

27        The doctrine of qualified immunity protects government officials "from liability for

28  civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Court conducts a two-step inquiry to determine whether an officer is entitled to qualified immunity. *See, e.g.*, *Groves v. City of Reno*, No. 3:13-cv-00537-MMD-WGC, 2015 WL 5350099, *4 (D. Nev. Sept. 14, 2015). The two-prong inquiry is "(1) [W]hether the facts shown make out a violation of a constitutional right; and (2) if so, whether the constitutional right was clearly established as of the date of the alleged misconduct." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "A [g]overnment official's conduct violates clearly established law when, at the time of the challenged conduct, [t]he contours of [a] right [are] sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011) (quotation marks and citation omitted). The Supreme Court has cautioned courts "not [to] define clearly established law at a high level of generality." *Id.* at 742 (citations omitted). Yet, it is "clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer,* 536 U.S. 730, 741 (2002).

"The Supreme Court has instructed that district judges may use their discretion in deciding which qualified immunity prong to address first based on the circumstances of the case at issue." *Id.* (citing *Pearson*, 555 U.S. at 232, 236). Here, the Court reaches both prongs of the inquiry on Plaintiff's Fifth, Fourteenth, and Fourth Amendment claims but only finds it necessary to address the first prong on Plaintiff's conspiracy claims and the second prong on Plaintiff's failure to intervene claim.[6]

### 1.    Fifth Amendment

The Fifth Amendment protects individuals from self-incrimination. U.S. Const. amend. V. Under the Fifth Amendment, suspects have a right to be free from coercive

---

[6]The Court addresses Louisiana Defendants' Fourth Amendment and conspiracy arguments under the first prong of the inquiry because while Louisiana Defendants do not seem to assert qualified immunity on these claims, they do argue that they did not violate Plaintiff's constitutional rights under either claim. (*See* ECF No. 216 at 25-27, 29-30; ECF No. 257 at 18-20.)

1    interrogation. *Cunningham v. City of Wenatchee*, 345 F.3d 802, 810 (9th Cir. 2003). The

2    Supreme Court established in *Miranda v. Arizona* that law enforcement officers must

3    provide warnings to individuals who are in custody in order to combat the inherently

4    compelling pressures of custodial interrogation. *Miranda*, 384 U.S. at 467.[7] "Failure to

5    administer *Miranda* warnings creates a presumption of compulsion." *Oregon v. Elstad*, 470

6    U.S. 298, 307 (985).

7         Here, Reno and Louisiana Defendants contend that their failure to administer

8    Miranda warnings does not create a presumption that they compelled Plaintiff's confession

9    because she was not in custody during the March 7 interview. (ECF No. 206 at 17-18;

10   ECF No. 216 at 17-18.) Additionally, they contend that their interview of Plaintiff was

11   proper under the circumstances. (*Id.*) The Court addresses each contention in turn.

### a.    Custodial Interrogation

13        Two inquiries are necessary to determine whether Plaintiff was in custody during

14   her interview. First, what objective circumstances surrounded the interrogation. *Thompson*

15   *v. Keohane*, 516 U.S. 99, 112 (1995). Second, whether a reasonable person in Plaintiff's

16   circumstances would have believed she was free to terminate the interrogation and walk

17   away. *See U.S. v. Barnes*, 713 F.3d 1200, 1204 (9th Cir. 2013). Factors relevant to

18   whether an individual is in custody include: (1) the language used to summon the

19   individual; (2) the extent to which the individual is confronted with evidence of guilt; (3) the

20   physical surroundings of the interrogation; (4) the duration of the detention; and (5) the

21   degree of pressure applied to detain the individual. *U.S. v. Wauneka*, 770 F.2d 1434, 1438

22   (9th Cir. 1985).

23        Reno and Louisiana Defendants argue that Plaintiff volunteered to speak with the

24   officers[8] and that the interview occurred in an office of the hospital where Plaintiff had

25

26        ⁷Neither Reno nor Louisiana Defendants dispute that these rights were clearly
     established in 1979.

27

28        ⁸To the extent that Reno and Louisiana Defendants ask the Court to reconsider its
     ruling that Plaintiff's voluntariness claims are not barred by issue preclusion (ECF No. 206
     *(…fn. cont.)*

1   been staying for two weeks and had stayed on prior occasions. (ECF No. 206 at 17; ECF

2   No. 216 at 17.) They assert that Plaintiff could have ended the interview at any time, that

3   Plaintiff was free to leave the room, that Plaintiff was free to move around the hospital and

4   had done so during her stay, and that any restrictions on Plaintiff's movement during the

5   interview were the same restrictions that already existed during her hospital stay. (ECF

6   No. 206 at 17; ECF No. 216 at 17.)[9]

7          However, Plaintiff has provided evidence that she was in custody under the factors

8   outlined in *Wauneka*. For example, Plaintiff disputes that she volunteered to be

9   interviewed, pointing to her testimony that she only agreed to speak with the officers after

10  a "secretary or nurse" at the hospital suggested it. (ECF No. 238 at 46; ECF No. 206-2 at

11  141.) The Investigation Report details that Plaintiff was told that "it would be *necessary* for

12  her to talk about what she had talked about with Carol Sherman." (ECF No. 206-21 at 4

13  (emphasis added).) Additionally, Plaintiff testified that she continuously asked to go home

14  to her mother but was not allowed to leave. (ECF No. 206-2 at 172.) Plaintiff estimates

15  that the interview lasted four to five hours. (ECF No. 206-2 at 171.) The only people in the

16  room were Plaintiff, Dennison, Ashley, and Burks. (ECF No. 206-2 at 160; ECF No. 206-

17  21 at 3-4.) Dr. Boswell testified that Burks' presence at the interview "would have made

18  her probably feel more intimidated" because "aides being present for things like that are

19  usually for the purpose of control." (ECF No. 224-21 at 102-103.) Viewing the evidence

20  and drawing all inferences in the light most favorable to Plaintiff as the nonmoving party,

21

22  ─────────────────────

23  at 18; ECF No. 216 at 17 n.88), the Court declines to do so for the same reasons discussed
    *supra* Section IV.

24          [9]Louisiana Defendants also argue that Ashley has no liability for any *Miranda*
    violation because Ashley himself did not "use" Plaintiff's statements in a criminal

25  proceeding—instead, it was Washoe County officials that "used" Plaintiff's statement when
    they brought formal charges. (ECF No. 216 at 18.) But they do not address, nor they can

26  really dispute, that it was reasonably foreseeable Plaintiff's confession would be used
    against her. *See Stoot v. City of Everett*, 582 F.3d 910, 926 (9th Cir. 2009) (internal

27  quotation marks omitted) (finding that the defendant officer could be liable for the use of
    an allegedly coerced confession if it was reasonably foreseeable that the confession

28  "would be used against the suspect and would lead to the suspect's detention").

1   a rational trier of fact could find that a reasonable person in Plaintiff's circumstances would

2   not have felt free to terminate the interview and leave. Accordingly, a genuine issue of

3   material fact exists regarding whether Plaintiff's confession is presumed coerced because

4   Dennison and Ashely failed to administer *Miranda* warnings.

### b.    Coerciveness of Interview

6        Reno Defendants and Louisiana Defendants assert that there was no Fifth

7   Amendment violation because the interview was conducted properly under the

8   circumstances. (ECF No. 206 at 17; ECF No. 216 at 16, 19-20.)[10] Plaintiff counters that

9   given her mental condition at the time, her background, and the interrogation techniques

10  used by Dennison and Ashley, her confession was involuntary. (ECF No. 238 at 47-53.)

11       "[A] confession is coerced or involuntary if the defendant's will was overborne at

12  the time he confessed." *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005). To

13  determine if a suspect's will was overborne, courts use a totality of the circumstances test

14  that takes into account "both the characteristics of the accused and the details of the

15  interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Relevant factors

16  include age, education, if a *Miranda* warning was given, length of the detention and

17  questioning, and the use of physical punishment. *Id.* Criminal defendants do not have a

18  right "to confess to [a] crime only when totally rational and properly motivated . . .."

19  *Colorado v. Connelly*, 479 U.S. 157, 166 (1986). However, the mental state of a suspect,

20  including mental illness or the presence of a serious intellectual disability, "is relevant in

21  establishing a setting in which police coercion may overcome the will of a suspect." *U.S.*

22  *v. Preston*, 751 F.3d 1008, 1016 (9th Cir. 2014).

23       Here, Plaintiff has provided evidence that she was in a state of psychosis when she

24  was interviewed. Plaintiff was involuntarily committed to LSU Medical Center because she

25  was depressed and suicidal. (ECF No. 206-2 at 79-81; ECF No. 215-4 at 44; ECF No.

26

27  ─────────────

28  [10]Louisiana Defendants combine their Fourteenth Amendment due process arguments involving interrogation techniques that "shocks the conscience" and their Fifth Amendment involuntary confession arguments. (ECF No. 216 at 16-17.)

233-1 at 5; ECF No. 236-15 at 8-9.) She was diagnosed with schizophrenia. (ECF No. 206-19 at 15-16; ECF No. 215-4 at 21, 44.) Dr. Boswell testified that Plaintiff was "extremely psychotic" throughout her time at LSU Medical Center—she experienced auditory hallucinations and paranoid thinking, her thoughts did not logically follow one another, she didn't understand the "ramifications of what was going on around her" when asked questions, and she was "delusional" and "out of contact with reality most of the time." (ECF No. 206-19 at 17-19, 26; ECF No. 224-21 at 57; ECF No. 236-15 at 35; ECF No. 236-16 at 4.) She did not respond to medication, burned her arms with cigarettes, and heard voices that told her to gouge her own eyes out and to kill people. (ECF No. 224-21 at 30; ECF No. 206-19 at 17-18; ECF No. 236-15 at 12.) Plaintiff had to be placed in "four-point restraints" to prevent her from harming herself. (ECF No. 206-19 at 18, 20-21.) Her symptoms manifested "flagrantly" during her stay at LSU Medical Center. (ECF No. 206-19 at 20; ECF No. 224-21 at 57.) Ashley knew that Plaintiff was in the psychiatric ward of a hospital, that she was in "some type of insane condition" and that she would "float[] in and out . . . ." (ECF No. 206-22 at 160-161; ECF No. 224-13 at 3.) Dennison knew that Plaintiff was involuntarily committed at the hospital and that she "heard voices . . . ." (ECF No. 224-13 at 4.)

Plaintiff has also provided evidence that she has intellectual disabilities that would have made her more susceptible to coercion. Plaintiff's expert witness opines that Plaintiff had an IQ of 71, placing her in the 3rd percentile rank of the United States population. (ECF No. 233-1 at 9.) The expert witness indicates that Plaintiff had "deficits in attention and concentration, an inability to differentiate essential from non-essential details, poor social comprehension, impaired judgment, and sequential thinking." (*Id.*) Dr. Boswell also testified that Plaintiff could be "easily influenced" by people in "certain things," could not make rational choices, and observed that it was "more likely than not" that Plaintiff could not "comprehend her situation[.]" (ECF No. 224-21 at 65, 105-106; ECF No. 236-15 at 21-22.)

Given the evidence of Plaintiff's mental condition at the time of questioning—and

viewing this evidence and drawing all inferences in her favor—a rational jury could find that Plaintiff's confession was involuntary. *See Gladden v. Unsworth*, 396 F.2d 373, 380-81 (9th Cir. 1968) (stating that a confession is involuntary "[i]f by reason of mental illness . . . the confession in fact could not be said to be the product of a rational intellect and a free will").

A genuine issue of material fact also exists regarding whether Dennison and Ashley used coercive tactics when interviewing Plaintiff, particularly given her mental state. *See Preston*, 751 F.3d at 1016-1017 ("Official conduct that does not constitute impermissible coercion when employed with nondisabled persons may impair the voluntariness of the statements of persons who are mentally ill . . ..") (citing ABA Criminal Justice Mental Health Standards, Standard 7-5.8(b)). As discussed above, Plaintiff did not receive *Miranda* warnings before the interview, the interview may have lasted up to five hours, the only other people in the room were Dennison, Ashley, and Burks, and Burks' presence could have made the atmosphere more intimidating. *See supra* Section V.B.1.a.[11] Plaintiff testified that Dennison corrected her answers and suggested answers to her and Plaintiff's expert witness detailed that Dennison's questions were highly suggestive and that he supplied Plaintiff with non-public facts that made her confession seem more reliable. (ECF No. 206-2 at 232; ECF No. 235-19 at 8-10; ECF No. 236-13 at 31-32, 39-45.) Plaintiff was told no when she asked to leave the room and was not allowed to go to the bathroom. (ECF No. 206-2 at 187, 226, 230.) Viewing these facts in the light most favorable to Plaintiff, a reasonable finder of fact could determine that Dennison and Ashley violated Plaintiff's Fifth Amendment rights by using coercive interrogation techniques to compel her

---

[11]Louisiana Defendants also argue that Ashley could not have coerced any statements from Plaintiff because he never asked questions during the interview. (ECF No. 216 at 19; ECF No. 257 at 10.) However, under the circumstances of the interview—and particularly the undisputed fact that the only people in the room were Plaintiff, Dennison, Ashley, and Burks—the extent to which Ashley's presence contributed to the coercive atmosphere is a factual dispute that must be left to the jury. *See Anderson*, 477 U.S. at 249 (at summary judgment the judge's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial").

1    confession.

2        Relying on the second prong of the inquiry, Louisiana Defendants argue that even

3    if Plaintiff can provide evidence that Ashley violated her Fifth Amendment rights, it was not

4    clearly established in 1979 that Plaintiff had a "right to be questioned without coercive

5    interview techniques given her mental state." (ECF No. 216 at 20-21.) However, the law

6    was clearly established in 1979 that an officer violates the Constitution by coercing an

7    involuntary confession from a mentally ill and psychotic suspect. *See Blackburn v. State*

8    *of Ala.*, 361 U.S. 199, 207 (1960) (finding that officers unconstitutionally coerced an

9    involuntary confession from a plaintiff diagnosed with "schizophrenic reaction, paranoid

10   type" who "was insane and incompetent at the time he allegedly confessed," by

11   interrogating him in a small room without friends, family, or legal counsel for several

12   hours); *Fikes v. State of Ala.*, 352 U.S. 191, 197 (1957) (finding that a "schizophrenic and

13   highly suggestible" suspect's confession was involuntary where officers placed plaintiff in

14   jail, kept him from friends and family, and asked "quite leading or suggestive" questions);

15   *Spano v. New York*, 360 U.S. 315, 321 (1959) (officers who forced an involuntary

16   confession from a suspect with "a history of emotional instability" by subjecting him to

17   coercive interrogation techniques including the use of leading questions in an lengthy

18   interrogation violated the Constitution.)

19       It is undisputed that Plaintiff was interviewed without friends, family, or an attorney

20   present after being involuntarily committed to a mental hospital for over a week and

21   diagnosed with chronic schizophrenia. (ECF No 215-4 at 21; ECF No. 206-21 at 4.) If

22   Plaintiff's version of the interview is to be believed—that she was interviewed for four to

23   five hours with highly suggestive questions while she was extremely psychotic and

24   experiencing violent delusions—then Dennison and Ashley violated her clearly

25   established Fifth Amendment rights.

26       Genuine issues of material facts preclude a finding as a matter of law that Dennison

27   and Ashley's alleged violating conduct was, or was not, inconsistent with clearly

28   established law. *See Conner v. Heiman*, 672 F.3d 1126, 1131 (9th Cir. 2012) (internal

1  quotation marks omitted) (finding that "where historical facts material to the qualified

2  immunity determination are in dispute . . . the district court [should] submit the issue to a

3  jury"). Therefore, the Court denies summary judgment on qualified immunity grounds for

4  Plaintiff's Fifth Amendment claims.[12]

5  ## 2.    Fourteenth Amendment

6  Reno and Louisiana Defendants argue that Plaintiff has failed to demonstrate that

7  Dennison, Ashley, and Lewis deliberately fabricated evidence against her or that any

8  alleged fabrication caused her deprivation of liberty. (ECF No. 206 at 18-19; ECF No. 216

9  at 17-21; ECF No. 257 at 17-18.) The Court finds that genuine issues of material fact exist

10  regarding whether Dennison and Ashley deliberately fabricated evidence against Plaintiff

11  and caused her detention, but Plaintiff fails to meet her burden against Lewis.[13]

12  It is "virtually self-evident" that "there is a clearly established constitutional due

13  process right not to be subjected to criminal charges on the basis of false evidence that

14  was deliberately fabricated by the government." *Devereaux v. Abbey*, 263 F.3d 1070,

15  1074-75 (9th Cir. 2001).[14] A plaintiff prevails on a due process fabrication of evidence

16  claim if she establishes that "(1) the defendant official deliberately fabricated evidence and

17  (2) the deliberate fabrication caused the plaintiff's deprivation of liberty." *Spencer v. Peters*,

18  857 F.3d 789, 798 (9th Cir. 2017).[15] Deliberate fabrication can be shown by either "direct

19

20  [12]As this is dispositive of the matter, the Court does not reach Plaintiff's other Fifth

21  Amendment argument that Dennison continued to ask Plaintiff about the murder after Plaintiff invoked her right to counsel. (ECF No. 238 at 54.)

22  [13]Plaintiff has abandoned her due process claims involving actions that "shock the conscience" and that Defendants suppressed evidence in violation of *Brady v. Maryland*,

23  373 U.S. 83 (1963). (ECF No. 238 at 43.) Therefore, the Court does not address arguments regarding those claims. (*See* ECF No. 206 at 19; ECF No. 216 at 24-25.)

24  [14]Reno and Louisiana Defendants do not dispute that this right was clearly

25  established in 1979.

26  [15]Reno and Louisiana Defendants base their due process arguments primarily on

27  the standard articulated in *Devereaux*, which required plaintiffs to demonstrate that "(1) Defendants continued their investigation of [plaintiff] despite the fact that they knew or should have known that [s]he was innocent; or (2) Defendants used investigative

28  techniques that were so coercive and abusive that they knew or should have known that *(…fn. cont.)*

1   evidence of fabrication" or "circumstantial evidence related to a defendant's motive."

2   *Caldwell v. City and County of San Francisco*, 889 F.3d 1105, 1112 (9th Cir. 2018). An

3   example of direct evidence of fabrication is "when an interviewer deliberately

4   mischaracterizes witness statements in her investigative report." *Id*. at 793.

5          Plaintiff has provided direct evidence to support her contention that Dennison and

6   Ashley deliberately fabricated evidence in the investigation. For example, the Investigation

7   Report—prepared by Dennison with assistance from Ashley—and the Specific Information

8   Report—which Ashley may have helped Dennison in creating, *see* discussion *infra* n.16—

9   claim that Plaintiff provided detailed descriptions of the crime including that she purchased

10  a knife and intended to kill someone, she took Michelle to a garage, Michelle laughed at

11  her, Michelle said "please don't kill me," Michelle was kneeling and fell forward after the

12  attack, she moved Michelle's body after the attack, and Plaintiff provided a physical

13  description of the knife used in the attack. (ECF No. 206-21 at 2, 4, 5, 7, 9; ECF No. 224-

14  11 at 2, 3.) The Search Warrant Affidavit and Arrest Warrant Affidavit, both prepared by

15  Dennison, also state that Plaintiff provided many of these facts. (ECF No. 224-8 at 3; ECF

16  No. 224-15 at 24, 26.) However, Plaintiff testified that she did not say any of these things

17  during the interview, and that the officers told her details that she "never heard in the news"

18  about the crime. (ECF No. 206-2 at 164-169, 171, 228.) This competing evidence creates

19  a genuine issue of material fact as to whether Dennison and Ashley deliberately fabricated

20  evidence against Plaintiff in their investigation.

21         Louisiana Defendants argue that that even if Plaintiff can show that Ashley helped

22  fabricate statements in the Investigation Report, there is no evidence that he did so

23

24  _____

25  those techniques would yield false information." (ECF No. 206 at 18; ECF No. 216 at 19.)
    Plaintiff—and the Court—also applied this standard previously. (*See* ECF No. 77 at 32;
26  ECF No. 101 at 26-27.) However, the Ninth Circuit has clarified that this standard only
    applies when a plaintiff relies on circumstantial evidence of fabrication and "those methods
27  of proving deliberate fabrication are unnecessary in a case involving direct evidence of
    deliberate fabrication." *Spencer*, 857 F.3d at 799; *see also Caldwell*, 889 F.3d at 1112. As
28  the operative complaint (ECF No. 170) was filed after the Ninth Circuit issued these
    decisions, the Court applies the more recent standard.

1    deliberately or that the statements were even material. (ECF No. 216 at 22.) They contend

2    that any of Plaintiff's allegedly fabricated statements containing non-public information in

3    the Investigation Report could not have come from Ashley, because he had no knowledge

4    of the murder until two days before the interview. (*Id.* at 22.) Moreover, they assert that

5    Plaintiff cannot even establish what information regarding the crime was public or non-

6    public at the time because of extensive media coverage after the crime. (*Id.*) They also

7    argue that the Investigation Report contains both exculpatory and inculpatory statements

8    undermining Plaintiff's argument that Dennison and Ashley were fabricating evidence to

9    fit their narrative of the crime. (*Id.*) The Court disagrees.

10    Given that the Investigation Report attributes numerous, detailed statements to

11    Plaintiff describing the location of the crime, the manner in which the murder was

12    committed, and the murder weapon itself, a reasonable trier of fact could find that they

13    were deliberately fabricated and material. *See Spencer*, 857 F.3d at 798 (overturning

14    judgment as a matter of law on deliberate fabrication claim where plaintiff introduced

15    evidence that a defendant's "investigative reports contained scores of quotations" that

16    plaintiff claimed were never said.) Additionally, Dennison's Search Warrant Affidavit

17    identifies what information was non-public at the time of the interview. (ECF No. 224-8 at

18    2; ECF No. 224-11.) Plaintiff has also provided evidence that Ashley may have helped

19    Dennison create the Specific Information Report, which contains facts that the Search

20    Warrant Affidavit identified as non-public. (*See* ECF No. 235-17 at 15 (stating that the

21    Specific Information Report and the Investigation Report were prepared "at the same time"

22    and "one right after the other").) As such, a genuine issue of material fact exists regarding

23    Ashley's knowledge of public and non-public information at the time of the interview. (*See*

24    ECF No. 224-24 at 8-9.)[16] Finally, the issue of whether exculpatory information in the

25

26    ――――――――――

27    [16]Louisiana Defendants argue that because Plaintiff's counsel during her first trial
     conceded that Dennison prepared the Specific Information Report alone, it is conclusively
     established that Ashley did not assist in creating the Report. (ECF No. 257 at 15.)
28    Louisiana Defendants fail to provide any case law describing why Plaintiff would be
     *(…fn. cont.)*

17

1   Investigation Report undermines Plaintiff's contention that Dennison and Ashley fabricated

2   evidence to fit their narrative must be left to the jury to resolve. *See Anderson*, 477 U.S.

3   at 255 (stating that "[c]redibility determinations, the weighing of the evidence, and the

4   drawing of legitimate inferences from the facts are jury functions" at summary judgment.)

5       Plaintiff has further established a genuine issue of material fact regarding the

6   causation element of the claims against Dennison and Ashley. To prove causation, a

7   plaintiff "must establish both causation-in-fact and proximate causation." *Harper v. City of

8   Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008). A plaintiff "need not be convicted on

9   the basis of the fabricated evidence to have suffered a deprivation of liberty—being

10   criminally charged is enough." *Caldwell*, 889 F.3d at 1115.

11       Ashley testified that he understood that his reports would be "communicated to

12   Reno" and "at some point" realized that Plaintiff was being prosecuted for murder. (ECF

13   No. 206-22 at 273.) Dunlap testified that he "relied" on the Investigation Report. (ECF No.

14   235-18 at 262.)[17] The Investigation Report and the Specific Information Report were used

15   throughout Plaintiff's criminal proceedings. (*See e.g.,* ECF No. 224-24 at 8; ECF No. 235-

16   17 at 14-15; ECF No. 235-16 at 16; ECF No. 206-18 at 15; ECF No. 236-11 at 95-97.)

17   Based on these facts, a reasonable trier of fact could determine that fabricated statements

18   in reports prepared by Dennison and Ashley were the cause-in-fact and proximate cause

19   of Plaintiff's deprivation of liberty.[18] *See Pac. Shores Prop., LLC v. City of Newport Beach*,

20

21   _____

22   precluded from making a different argument now—after Plaintiff's conviction has been
    vacated—in this action. Accordingly, the Court rejects Louisiana Defendants' argument.

23       [17]Louisiana Defendants dispute Plaintiff's characterization of Dunlap's testimony,
    insisting that Dunlap stated that he relied on statements in the Investigation Report to

24   determine what Plaintiff stated in the interview, not that he relied on statements in the
    Report in deciding to bring charges. (ECF No. 257 at 18.) However, "it is the "jury's

25   province to . . . resolve any factual disputes." *First Nat. Mortg. Co. v. Fed. Realty Inv. Trust*,
    631 F.3d 1058, 1069 (9th Cir. 2011).

26

27       [18]Louisiana Defendants also argue that there is no causation because there was
    still probable cause to prosecute without the allegedly fabricated statements. (ECF No.

28   216 at 24.) The Court rejects this argument because, in the Fifth Amendment context,
    "[w]hether probable cause existed is entirely beside the point of th[e] inquiry, The only
    *(…fn. cont.)*

1  730 F.3d 1142, 1168 (9th Cir. 2013) ("Causation is an intensely factual question that

2  should typically be resolved by a jury.").

3        However, Plaintiff has failed to meet her burden regarding causation as to Lewis.

4  Plaintiff's due process claim against Lewis contends that he fabricated information in his

5  March 8 Report that Plaintiff described the purported murder weapon "as a butcher knife"

6  and attempted to locate it during the search of her mother's home. (ECF No. 224-7 at 2.)[19]

7  Plaintiff provided evidence that this was not true, testifying that she never described the

8  knife or attempted to locate the knife during the search. (ECF No. 206-2 at 174.) Lewis'

9  March 9 Report indicates that the previous March 8 Report was produced to the

10  prosecutor. (ECF No. 224-12 at 4 (stating "[a]ll records and photographs are to be

11  forwarded to Reno for investigative purposes"). However, Plaintiff does not describe how

12  these alleged fabrications influenced any aspect of the investigation. Moreover, unlike the

13  Investigation Report and the Specific Information Report, nothing in the record indicates

14  that Dunlap relied on Lewis' March 8 Report in prosecuting Plaintiff or that it was ever

15  referenced at trial. There is no evidence that the alleged fabrication in Lewis' March 8

16  Report played a role in the investigation and prosecution of Plaintiff.

17        The Court therefore denies summary judgment on Plaintiff's Fourteenth

18  Amendment due process claims against Dennison and Ashley. However, the Court grants

19  summary judgment for Louisiana Defendants on this claim as to Lewis.

20            **3.    Fourth Amendment**

21        Reno and Louisiana Defendants argue that Plaintiff cannot establish the element

22  of a lack of probable cause on her Fourth Amendment malicious prosecution claims. (ECF

23

24        causation question . . . [is] whether the fabricated evidence did, in fact, cause [Plaintiff's]

25  imprisonment." *Spencer*, 857 F.3d at 802.

26        [19]To the extent Plaintiff argues that Lewis' March 9 Report was also fabricated because it described the photograph taken at Plaintiff's mother's home of the butcher

27  knife, the Court is unpersuaded as the Report explicitly states that the knife "was not believed to be the murder weapon but was only for comparison purposes" and there is no

28  indication that this Report was used in the investigation or prosecution of Plaintiff. (ECF No. 238 at 25-26; ECF No. 224-12 at 4.)

No. 206 at 19-21; ECF No. 216 at 25-27.) Plaintiff counters that there was no probable cause for her arrest and subsequent detention because the basis of Plaintiff's arrest and detention included evidence fabricated by Dennison, Ashley, and Lewis. (ECF No. 238 at 61-64.)

Federal courts rely on state common law for elements of malicious prosecution. *Mills v. City of Covina*, 921 F.3d 1161, 1169 (9th Cir. 2019). In Nevada, to state a claim for malicious prosecution the plaintiff must show: "(1) want of probable cause to initiate the prior criminal proceeding; (2) malice; (3) termination of the prior criminal proceedings; and (4) damages." *LaMantia v. Redisi*, 38 P.3d 877, 879 (Nev. 2002). A claim for malicious prosecution under 42 U.S.C. § 1983 additionally requires a plaintiff to show that defendants prosecuted her "for the purpose of denying [her] equal protection or another specific constitutional right." *Mills*, 921 F.3d 1161, 1169 (9th Cir. 2019) (citation omitted).[20] Where a plaintiff's claim that "a form of legal process resulted in pretrial detention unsupported by probable cause, then the right allegedly infringed lies in the Fourth Amendment." *Manuel*, 137 S.Ct. at 919.[21] Such a violation occurs when an officer holds an individual "without any reason before the formal onset of a criminal proceeding" but it can also occur "when legal process itself goes wrong" such as when a judge relies "solely on a police officer's false statements" to decide the issue of probable cause. *Id.* at 918.

---

[20]Plaintiff argues that because of the Supreme Court's decision in *Manuel v. City of Joliet, III* and the Ninth Circuit's subsequent ruling in *Page v. King*, she need only show that Defendants proximately caused her to be unlawfully detained without probable cause. (ECF No. 238 at 60 n.20.) However, *Page* simply acknowledged that Section 1983 malicious prosecution claims are based on the Fourth Amendment, not the Fourteenth Amendment. *Page v. King*, 932 F.3d 898, 905 (9th Cir. 2019). And the Ninth Circuit continues to apply the applicable state common law elements to Section 1983 malicious prosecution claims after *Manuel. See Manuel v. City of Joliet, Ill.*, 137 S.Ct. 911, 919 (2017); *see e.g. Mills*, 921 F.3d 1161, 1169 (9th Cir. 2019); *Leonetti v. Bray*, 774 F. App'x. 417, 418 (9th Cir. 2019); *Lopez v. Newport Beach Police Dep't*, 792 F. App'x. 535 (9th Cir. 2020).

[21]Reno and Louisiana Defendants do not dispute that this right was clearly established in 1979. *See e.g., Beck v. State of Ohio*, 379 U.S. 89, 91 (1964) ("Whether [an] arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it.").

1    "Where the facts or circumstances surrounding an individual's arrest are disputed . . . the

2    existence of probable cause becomes a question of fact for the jury." *Borunda v.*

3    *Richmond*, 885 F.2d 1384, 1391 (9th Cir. 1988).

4         Genuine issues of material fact exist regarding whether there was probable cause

5    to arrest and detain Plaintiff. As discussed *supra* Section V.B.2., Plaintiff has provided

6    evidence that Dennison and Ashley fabricated evidence against her by attributing to her

7    numerous, non-public facts about the attack that she claims she never made or was

8    pressured into making. (*See* ECF No. 206-21 at 2, 4, 5, 7, 9; ECF No. 224-11 at 2-3; ECF

9    No. 206-2 at 164-169, 171.) Plaintiff has also provided evidence that these fabrications

10   caused her arrest and prosecution. (*See* ECF No. 206-22 at 273; ECF No. 224-15 at 24,

11   26; ECF No. 235-18 at 262.)[22] Viewing this evidence in the light most favorable to Plaintiff

12   as the non-moving party, a reasonable trier of fact could determine that Plaintiff's arrest

13   and subsequent detention lacked probable cause because of Dennison and Ashley's

14   alleged fabrications. *See Tatum v. Moody*, 768 F.3d 806, 817 (9th Cir. 2014) ("[A] § 1983

15   defendant is liable for setting in motion a series of acts by others which the actor knows

16   or reasonably should know would cause others to inflict the constitutional injury.").

17   However, for the same reasons discussed under Plaintiff's Fourteenth Amendment due

18   process claims, Plaintiff has not provided evidence that any alleged fabrication in Lewis'

19   March 8 Report led to Plaintiff's arrest or prosecution. *See* discussion *supra* Section V.B.2.

20        Reno Defendants contend that probable cause existed even without the alleged

21   fabricated statements because Dennison knew that Plaintiff had confessed to multiple

22   people on several different occasions that she had murdered someone named Michelle in

23   Reno, Plaintiff had given descriptions of another death—Melody Lounsberry—that were

24   accurate, she lived and worked near Lounsberry, she could occasionally be lucid, LSU

25

26        [22]For this reason, the Court rejects the argument that Ashley is shielded from
     liability because Dunlap exercised independent prosecutorial judgment in deciding to
27   prosecute Plaintiff (ECF No. 216 at 26; ECF No. 257 at 18-19). *See Caldwell*, 889 F.3d at
     1116 ("Deliberately fabricated evidence in a prosecutor's file can rebut any presumption
28   of prosecutorial independence.").

1   Medical Center staffers believed Plaintiff committed the murder, and LSU Medical Center

2   staff treated Plaintiff as capable of making her own decisions. (ECF No. 206 at 20.)

3   However, the extent to which the prosecution relied on these additional facts when

4   deciding if probable cause existed to arrest and detain Plaintiff is a factual dispute for the

5   trier of fact to resolve. *See Reed v. Lieurance*, 863 F.3d 1196, 1205 (9th Cir. 2017) (stating

6   that at the summary judgment stage "factual disputes material to the question of probable

7   cause" are "the province of the jury").[23]

8       The Court thus grants summary judgment for Louisiana Defendants on Plaintiff's

9   Fourth Amendment malicious prosecution claim as to Lewis but denies summary judgment

10  as to Dennison and Ashley.

11                          **4.    Failure to intervene**

12      Louisiana Defendants argue that Ashley is entitled to qualified immunity on

13  Plaintiff's failure to intervene claim because there was no clearly established duty to

14  intervene outside of the excessive force context in 1979. (ECF No. 216 at 28.)[24] The Court

15  agrees.[25]

16      Plaintiff fails to demonstrate that Ashley had a clearly established duty to intervene

17  in 1979 to prevent a Fifth Amendment involuntary confession violation, a Fourteenth

18  Amendment due process violation, or a Fourth Amendment malicious prosecution

19  violation. The out-of-circuit cases cited by Plaintiff are inapposite as almost all of them

20  involve a failure to intervene to prevent excessive force. (ECF No. 238 at 67.) *See*

21

22      [23]Louisiana Defendants also argue that to the extent Plaintiff alleges that Ashley
        and Lewis violated Plaintiff's Fourth Amendment rights during the interview at LSU Medical
23      Center, or by performing an unlawful search, those claims would be time-barred. (ECF
        No. 216 at 27; ECF No. 257 at 19 n.65.) However, Plaintiff has not presented any claims
24      that the interview itself or the search violated her Fourth Amendment rights. (*See generally*
        ECF No. 170 at 35-36; ECF No. 238 at 60-64.)

25      [24]Plaintiff has abandoned her failure to intervene claim against Lewis. (ECF No.
26      238 at 67, n.23.)

27      [25]Because this is dispositive of the issue, the Court declines to address Louisiana
        Defendants' remaining argument that nothing about the March 7 interview would have
28      alerted Ashley as to any potential constitutional violations. (ECF No. 216 at 28.)

*Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005); *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994); *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2nd Cir. 1988); *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972). And while Plaintiff cites to a few cases outside of the excessive force context, those cases do not involve any duty to intervene. *See Smith v. Ross*, 482 F.2d 33, 36 (6th Cir. 1973) (finding no conspiracy liability for officer who told plaintiffs he could not protect them from hostile townspeople threatening them with violence); *Whirl v. Kern*, 407 F.2d 781, 785 (5th Cir. 1969) (finding that a sheriff and a jailer could both be liable for false imprisonment by keeping a prisoner incarcerated for nine months after his sentence was vacated); *Nesmith v. Alford*, 318 F.2d 110, 119 (5th Cir. 1963) (finding that two officers could both be liable for false arrest by ordering a plaintiff's arrest and driving the plaintiff to jail).[26] Given the state of the law at the time, it would not have been apparent to a reasonable officer that there was a duty to intervene to prevent a violation of Plaintiff's rights under these circumstances.[27] The Court therefore grants summary judgment for Louisiana Defendants based on qualified immunity.

### 5.    Conspiracy[28]

To establish a conspiracy claim under Section 1983, a plaintiff must demonstrate: (1) the existence of an express or implied agreement among the defendant officers to deprive a person of her constitutional rights, and (2) an actual deprivation of those rights resulting from that agreement. *Avalos v. Baca*, 517 F. Supp. 2d 1156, 1166 (C.D. Cal. 2007) (citing *Ting v. United States*, 927 F.2d 1504, 1512 (9th Cir. 1991)). One can infer

---

[26]As Louisiana Defendants note, even today the Ninth Circuit holds that there is no "general duty to intercede whenever fellow officers are engaged in constitutional violations regardless of whether there is violent force involved." *Crim v. King*, 65 F. App'x. 591, 593 (9th Cir. 2003) (internal quotation marks omitted).

[27]To the extent Plaintiff argues that the broad language used in *Byrd* and *Abdullahi* clearly established a duty to intervene outside of the excessive force context, the Supreme Court has instructed that the clearly established inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015).

[28]Because the legal elements are similar, the Court addresses Plaintiff's Section 1983 and state law conspiracy claims collectively.

1   an agreement from the defendant's acts pursuant to the conspiratorial scheme or from

2   other circumstantial evidence. *Id.* at 1170. Similarly, under Nevada law, "[a]n actionable

3   civil conspiracy consists of a combination of two or more persons who, by some concerted

4   action, intend to accomplish an unlawful objective for the purpose of harming another, and

5   damage results from the act or acts." *Consol. Generator-Nevada, Inc. v. Cummins Engine*

6   *Co., Inc.*, 971 P.2d 1251, 1256 (Nev. 1998) (internal quotation marks and citation omitted).

7           "Direct evidence of improper motive or an agreement among the parties to violate

8   a plaintiff's constitutional rights will only rarely be available. Instead, it will almost always

9   be necessary to infer such agreements from circumstantial evidence or the existence of

10  joint action." *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1302 (9th Cir.

11  1999). Accordingly, the existence of a conspiracy "is generally a factual issue and should

12  be resolved by the jury, so long as there is a possibility that the jury can infer from the

13  circumstances" that a plaintiff has met the elements of the claim. *Id.* at 1301.

14          Reno and Louisiana Defendants argue that Plaintiff has failed to produce evidence

15  of an agreement between Defendants to violate Plaintiff's rights. (ECF No. 206 at 21-22;

16  ECF No. 216 at 29-30.) Specifically, they argue that law enforcement agencies from

17  different jurisdictions frequently work together during investigations, and that their

18  interactions in this case were routine. (ECF No. 206 at 21-22; ECF No. 216 at 29-30.)

19          Plaintiff fails to provide evidence of any agreement, explicit or implied, between

20  Defendants to violate her constitutional rights. Plaintiff argues that Dennison, Ashley, and

21  Lewis' alleged fabrication of Plaintiff's statements and Lewis' independent decision to

22  return to Plaintiff's mother's home on March 9 to obtain details regarding Wood's activities

23  in Reno, is evidence of a conspiracy. (*Id.* at 65-67.)[29] However—as the Court previously

24  explained in the order dismissing conspiracy claims against Dunlap (ECF No. 101 at 32)—

25  Defendants' alleged addition of fabricated statements may be proof of an overt act in

26

27          [29]Plaintiff also argues that Ashley placed false statements in his reports about the
    location of the knife, but as discussed *supra* n.2, Plaintiff's has admitted that she told
28  Dennison that she had the knife at her home in Shreveport. (*See* ECF No. 263.)

24

furtherance of a conspiracy, but they are insufficient to demonstrate the existence of any implicit agreement between Defendants. Similarly, Lewis' actions on March 9 do not indicate that he had any agreement with Dennison or Ashley to violate Plaintiff's constitutional rights because, as Plaintiff concedes, Lewis acted independently. (ECF No. 238 at 67.) The absence of evidence to establish the existence of any agreement necessitates summary judgment in favor of Defendants on Plaintiff's conspiracy claims.

### C.   State Law Claims

#### 1.   Abuse of Process

In Nevada, the elements of an abuse of process claim are: "(1) an ulterior purpose by the defendants other than resolving a legal dispute, and (2) a willful act in the use of the legal process not proper in the regular conduct of the proceeding." *LaMantia v. Redisi*, 38 P.3d 877, 879 (Nev. 2002).

Reno Defendants contend that because Plaintiff's abuse of process claim is based on the same conduct as her Section 1983 claims, the abuse of process claim fails for the same reasons. (ECF No. 206 at 23.) Louisiana Defendants argue that to the extent Plaintiff asserts this claim against Ashley and Lewis, Plaintiff has failed to provide any evidence against them. (ECF No. 216 at 30.) Plaintiff counters that the same evidence of deliberate fabrication of evidence by Dennison, Ashley, and Lewis that supports her due process claims also supports her claims of abuse of process. (ECF No. 238 at 71-72.) The Court agrees with Plaintiff.

The Court has already found genuine issues of material fact exist regarding whether Dennison and Ashley deliberately fabricated evidence against Plaintiff. *See* discussion *supra* Section V.B.2. And while Plaintiff has failed to provide evidence of causation on her fabrication of evidence claim against Lewis, under Nevada law an abuse of process claim does not have a causation element. *See LaMantia*, 38 P.3d at 879. Here, genuine issues of material fact exist regarding whether Lewis fabricated that Plaintiff attempted to find the knife in his March 8 Report. (ECF No. 206-2 at 174; ECF No. 224-7 at 2.) Whether this alleged fabrication was willful is a question for a jury. *Braxton-Secret v. A.H. Robins Co.*,

1   769 F.2d 528, 531 (9th Cir. 1985) ("Questions involving a person's state of mind . . . are

2   generally factual issues inappropriate for resolution by summary judgment.").

3       Accordingly, the Court denies summary judgement for Louisiana Defendants on

4   Plaintiff's abuse of process claim.

### 2.      Intentional Infliction of Emotional Distress

6       In order to succeed on a claim for intentional infliction of emotional distress under

7   Nevada law, a plaintiff must demonstrate: "(1) extreme and outrageous conduct with either

8   the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff's

9   having suffered severe or extreme emotional distress, and (3) actual and proximate

10  causation." *Star v. Rabello*, 625 P.2d 90, 91-92 (Nev. 1981).

11      Reno Defendants cite *Star* to argue that a claim for IIED did not exist in Nevada

12  1979. (ECF No. 206 at 23.)[30] *Star* does not support this broad argument. In *Star,* the

13  Nevada Supreme Court seemed to acknowledge that an IIED tort claim existed at the time,

14  but merely observed that "[t]here are no reported cases in this jurisdiction . . .." *Star*, 625

15  P.2d at 91. Moreover, *Star* involved a claim by someone who witnessed outrageous

16  conduct—a bystander. *Id.* Here, Plaintiff's claim is premised on outrageous conduct

17  allegedly inflicted directly on her—such tort claims have long been recognized in Nevada

18  even if the elements were not clearly defined. *See Marschall v. City of Carson*, 464 P.2d

19  494 (Nev. 1970) (recognizing a cause of action for "great emotional distress and anguish"

20  but not defining its elements); *Barnes v. W. Union Tel. Co.*, 76 P.931 (Nev. 1904)

21  (recognizing damages for "mental worry and distress").

22      Louisiana Defendants assert that they cannot be liable for IIED because they had

23  limited involvement with the investigation. (ECF No. 216 at 30.) They argue that Lewis

24  only drove officers to and from the search and was merely present for it, while Ashley only

25

26      [30]Reno Defendants argue that even if the IIED claim is legally cognizable, the claim
    still fails because they have already established that there was no wrongful underlying
27  conduct. (ECF No. 206 at 23.) But the Court finds that genuine issues of material fact exist
    regarding Dennison's conduct. *See* discussion *supra* Sections V.B.1., V.B.2., V.B.3.,
28  V.C.1.

1  attended the search and the March 7 interview both of which were conducted properly.

2  (*Id.*) But Louisiana Defendants fail to explain why their "limited involvement" would

3  preclude Plaintiff from establishing the elements of IIED. The extent of their involvement

4  is also disputed. The Court has already found genuine issues of material fact exist as to

5  whether Ashley violated Plaintiff's rights during and after the interview. And it is undisputed

6  that after the March 8 search, Lewis later returned to the home, interviewed Plaintiff's

7  mother about Plaintiff's activities in Reno, and photographed a kitchen knife "for

8  comparison purposes." (ECF No. 216 at 11; ECF No. 224-12.)

9       The Court therefore denies summary judgment on Plaintiff's IIED claim.[31]

10      **D.    Monell Liability**

11      Reno Defendants argue that Plaintiff has not established a basis for *Monell* liability

12  against the City of Reno because there is no evidence that Dennison violated Plaintiff's

13  rights pursuant to a policy, practice, or custom of the City and they have produced

14  evidence demonstrating that the City of Reno trained officers on compliance with the U.S.

15  Constitution and federal law. (*Id.*) Plaintiff counters that at the time the City of Reno had

16  no policies or training specifically addressing *Miranda* warnings or custodial interrogations.

17  (ECF No. 238 at 68-71.) The Court finds that genuine issues of material fact exist

18  regarding whether the City of Reno lacked sufficient policies and training for officers.[32]

19      A municipality may be found liable under Section 1983 only where the municipality

20  itself causes the violation at issue. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989)

21  (citing *Monell v. New York City Dept. of Soc. Serv.*, 436 U.S. 658 (1978)). To state a claim

22

23       [31]Louisiana Defendants' argument that Plaintiff's IIED claim is time-barred is legally
24  deficient as this claim is subject to the deferred accrual rule under *Heck. See Heck v. Humphrey*, 512 U.S. 477, 489-90 (1994) ("[A] § 1983 cause of action for damages
25  attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated."); *see also Vail v. Cortez-Masto*, No. 2:12-
26  cv-01148-MMD-CWH, 2013 WL 596096, at *2 (D. Nev. Feb. 15, 2013) (applying *Heck* to IIED claim).

27       [32]Because this is dispositive of the issue, the Court does not reach Plaintiff's
28  argument that the City of Reno directed and ratified Dennison's conduct. (ECF No. 238 at 69-70.)

1   for municipal or county liability, a plaintiff must allege that she suffered a constitutional

2   deprivation that was the product of a policy or custom of the local government unit. *City of*

3   *Canton*, 489 U.S. at 385. "Official municipal policy includes the decisions of a

4   government's lawmakers, the acts of its policymaking officials, and practices so persistent

5   and widespread as to practically have the force of law." *See Connick*, 563 U.S. at 61. "A

6   policy of inaction or omission may be based on failure to implement procedural safeguards

7   to prevent constitutional violations." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th

8   Cir. 2012). The omission standard is met where "the need for more or different training is

9   so obvious, and the inadequacy so likely to result in the violation of constitutional rights,

10  that the policymakers of the city can reasonably be said to have been deliberately

11  indifferent to the need." *City of Canton*, 489 U.S. at 390 (quotation and citation omitted).

12  "Whether a local government entity has displayed a policy of deliberate indifference is

13  generally a question for the jury." *Oviatt By and Through Waugh v. Pearce*, 954 F.2d 1470,

14  1478 (9th Cir. 1992).

15          As Plaintiff notes, while the City may have had general policies requiring officers to

16  comply with the Constitution, there is no evidence in the record demonstrating that the

17  City had specific policies regarding *Miranda* warnings or custodial interrogations.[33] *See*

18  *Long v. County of Los Angeles*, 442 F.3d 1178, 1189 (9th Cir. 2006) (stating that a

19  municipality's "lack of affirmative policies or procedures to guide employees can amount

20  to deliberate indifference, even when the [municipality] has other general policies in

21  place"). Moreover, Reno Defendants have failed to provide any evidence that describes

22

23

24

25          [33]Reno Defendants offer evidence of the City's general policies of compliance with
26  the Constitution. They particularly point to former Police Chief James Weston's testimony
    that the operations manual for the Reno Police Department Sixth Northern Nevada Police
27  Academy ("Academy") provided "general direction that you cannot violate an individual's
    rights during your job as a police officer" and that the "code of conduct" for officers stated
28  that "an officer has to comply with the rights of the suspect" and they "can't violate
    anybody's constitutional rights." (ECF No. 206-38 at 38, 42.)

the substantive details of the training officers received.[34] Given that police officers routinely interview and interrogate suspects, collect evidence, and provide *Miranda* warnings, a genuine issue of fact exists as to whether the City of Reno sufficiently trained officers to comply with the law, or if the training was so lacking as to amount to deliberate indifference.[35] *See Board of Cty. Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 409 (1997) (internal quotation marks omitted) ("The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected deliberate indifference to the obvious consequence of the policymakers' choice . . .."); *see also Oviatt By and Through Waugh*, 954 F.2d at 1478 ("Whether a local government entity has displayed a policy of deliberate indifference is generally a question for the jury.").

In sum, genuine issues of material fact exist regarding whether the City of Reno provided officers with sufficient policies and training regarding *Miranda* warnings and custodial interrogations to prevent violations of a suspect's constitutional rights. The Court denies summary judgment for Reno Defendants on Plaintiff's *Monell* claim.

### E.   Respondeat Superior and Indemnification

Reno Defendants argue that because there is no evidentiary support for Plaintiff's underlying claims, Plaintiff has no basis to recover under theories of respondeat superior and indemnification for the state tort claims. (ECF No. 206 at 23.) But, as discussed *supra* Sections V.C.1. and V.C.2., the Court finds genuine issues of material fact exist.

---

[34] Chief Weston also testified that officers received training on compliance with the law, including training in the Academy on *Miranda* warnings and other constitutional rights of suspects during interviews. (ECF No. 206-38 at 30, 53, 88, 107, 112.) However, Weston did not describe the details of any of this training, such as the specific topics covered or how officers were taught to comply with the law. (ECF No. 206-38 at 69-79.)

[35] Reno Defendants contend that the evidence shows that the City had appropriate policies and training, but that they were destroyed per the RPD's and the City's document retention policies. (ECF No. 256 at 16-18; *see also* ECF No. 206-15 at 21-22.) However, "[a] trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr*, 285 F.3d at 773.

1    Accordingly, the Court denies summary judgment for Reno Defendants on these theories

2    of recovery.

3    **VII.    CONCLUSION**

4          The Court notes that the parties made several arguments and cited to several cases

5    not discussed above. The Court has reviewed these arguments and cases and determines

6    that they do not warrant discussion as they do not affect the outcome of the motions before

7    the Court.

8          It is therefore ordered that Plaintiff's motion for leave to file sur-reply on the

9    summary judgment motions (ECF No. 262) is denied.

10          It is further ordered that Defendants City of Reno and Lawrence Dennison's motion

11   for summary judgment (ECF No. 206) and Defendants Donald Ashley and Clarence Lewis'

12   motion for summary judgment (ECF No. 216) are granted in part and denied in part. They

13   are granted as to Plaintiff's Fourteenth Amendment claim as to Lewis, Plaintiff's Fourth

14   Amendment claim as to Lewis, Plaintiff's conspiracy claims against all Defendants, and

15   Plaintiff's failure to intervene claim against Ashley. The motions are denied as to all

16   remaining claims and Defendants.

17          DATED THIS 21st day of July 2020.

18

19   _____

20   MIRANDA M. DU
     CHIEF UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

27

28

                                    30